| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF WISCONSIN<br><br>        Plaintiffs,<br><br>    v.<br><br>P. H. GLATFELTER COMPANY and<br>WTM I COMPANY<br>(f/k/a Wisconsin Tissue Mills Inc.),<br><br>        Defendants. | CIVIL ACTION NO. 03-C-0949<br><br>The Honorable Lynn Adelman |

**PLAINTIFFS' JOINT BRIEF IN SUPPORT OF MOTION TO ENTER "CONSENT DECREE FOR REMEDIAL DESIGN AND REMEDIAL ACTION AT OPERABLE UNIT 1 OF THE LOWER FOX RIVER AND GREEN BAY SITE"**

The United States of America (the "United States") and the State of Wisconsin (the "State") (collectively the "Plaintiffs"), file this joint brief in support of their motion to enter the pending "Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site" (the "Consent Decree"). The Consent Decree would require the Defendants to begin sediment remediation work in the portion of the Lower Fox River and Green Bay Site (the "Site") designated as Operable Unit 1 ("OU 1"), which is the furthest upstream area of contamination at the Site.[1] Cleanup design and planning work has already begun, and the Defendants have already made certain initial payments due under the Decree. The Decree requires much larger payments by the Defendants – totaling $52.5 million –

---

[1] OU 1 comprises approximately 6 miles of the Lower Fox River – a segment of the River commonly called Little Lake Butte des Morts – starting at Lake Winnebago at the Neenah Dam and the Menasha Dam downstream to the Upper Appleton Dam.

in March and June of 2004, so that the OU 1 remedial action work can begin this summer. The Plaintiffs and the Defendants all support entry of the Consent Decree.

Since the Decree was lodged with the Court, the Plaintiffs held a public meeting on the settlement and the United States published notice of the settlement in the Federal Register and solicited public comments in accordance with the governing law, including Section 122(d)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9622(d)(2). See 68 Fed. Reg. 59821 (Oct. 17, 2003). The United States received sixteen sets of comments, which are reproduced in the accompanying "Appendix of Public Comments." Most of the comments focus on just one issue, and urge a change in the OU 1 cleanup remedy to preclude possible disposal of dredged sediment at a particular landfill located in the Town of Vinland in Winnebago County. As an alternative to landfill disposal, those comments advocate treatment of dredged material by an innovative sediment melting process known as vitrification.

The remedy selection decision for OU 1, including the requirement to dispose of dredged sediment in an appropriate landfill, is set forth in a Record of Decision ("ROD") signed by the U.S. Environmental Protection Agency ("EPA") and the Wisconsin Department of Natural Resources ("WDNR") in December 2002.[2] The ROD does not require disposal at any particular landfill. It indicates that "[d]isposal of PCB contaminated sediment from OU 1 will be to either an existing upland landfill or into a newly constructed or modified landfill designed to receive the dewatered sediment" in accordance with "the siting requirements for a landfill (Chapter 289, Wisconsin Statutes) and the technical requirements for construction, operation, and closure of a

---

[2]     Pertinent portions of the ROD are reproduced as Appendix H to the Consent Decree.

- 2 -

landfill in the NR 500 rule series, WAC." ROD at 58. Disposal at the Vinland Landfill is being considered, but a specially-constructed landfill expansion would be required for OU 1 sediment. Consistent with the State's landfill siting statutes, the owner of the Vinland landfill is now negotiating with the Town of Vinland for local approval to expand the landfill, and the matter would proceed to arbitration before the Wisconsin Waste Facility Siting Board if those parties cannot reach an agreement.

As explained below, EPA and WDNR have determined that landfill disposal of dredged sediment is the best option under the remedy selection criteria specified by the governing regulations, based on a comprehensive analysis of multiple disposal alternatives during the remedy selection process, and confirmed by continued evaluation of disposal options since selecting the cleanup remedy for OU 1. That analysis included funding a series of vitrification studies, including a pilot-scale sediment melter demonstration project with sediment removed from the Site. EPA and WDNR have concluded that a change to the OU 1 remedy is not justified at this time because treatment of contaminated sediment by vitrification would be more difficult to implement, less effective in the short-term, and much more costly than landfill disposal of OU 1 sediment. For those reasons, and as detailed below, the Plaintiffs have determined that nothing in the comments would justify withdrawal of their consent to the Decree or change their belief that the Decree is fair, reasonable, and consistent with CERCLA.

Section I of this Brief provides relevant background information and summarizes the key terms of the settlement. Section II discusses the legal standard governing the Court's review of the settlement. Section III demonstrates that the settlement should be approved because it is fair, reasonable, and consistent with the purposes of CERCLA. Section IV reviews and responds to

- 3 -

the issues raised by the comments, and concludes that no issues raised by the comments should preclude  approval and entry of the Decree.

## I.  BACKGROUND ON THE SITE AND THE CONSENT DECREE

### A.     The Lower Fox River and Green Bay Site

Sediment in the Lower Fox River and the Bay of Green Bay is contaminated with polychlorinated biphenyls ("PCBs") released from paper production facilities and paper coating facilities located in the Fox River Valley.  The PCBs were the solvent in an emulsion used to produce "carbonless" copy paper from at least the 1950s to the early 1970s.  PCBs were released to the River both in the production of carbonless paper at certain Fox River Valley facilities, and in the reprocessing of carbonless waste paper at other facilities in the Valley.  As a result of the PCB contamination, fish and waterfowl in the area are subject to human-health based consumption advisories issued by WDNR and the Michigan Department of Community Health.

### B.     The Plaintiffs' Response and Restoration Efforts

The Plaintiffs are now involved in separate but coordinated efforts addressing both: (1) cleanup-related actions, known as "response actions" or "remedial action" under CERCLA, that will mitigate the hazards to human health and the environment posed by the PCBs in the Fox River and Green Bay; and (2) compensation for the natural resource injuries caused by the PCBs, for use to restore, replace, or protect natural resources, under the natural resource damages provisions of CERCLA.  The overall effort is being managed under a formal Memorandum of Agreement among the relevant Federal, State, and Tribal agencies, as "Inter-Government Partners" sharing a "mutual goal of remediating and/or responding to hazardous substance releases and threats of releases, and restoring injured and potentially injured natural resources"

- 4 -

in the environment in and around the Lower Fox River and Green Bay.[3]

As the two agencies responsible for cleanup-related actions, EPA and WDNR have taken significant steps to address the PCB contamination that remains in the Fox River and Green Bay. Following the process established by CERCLA and the implementing regulations, known as the National Contingency Plan ("NCP"), EPA and WDNR have completed a detailed Remedial Investigation and Feasibility Study for the Site and have issued two RODs selecting the "remedial action" that will be required at the five geographically-defined Operable Units ("OUs") at the Site. The first ROD, finalized in December 2002, addresses the two uppermost segments of the River, which the agencies designated OUs 1 and 2. The second ROD, issued in July 2003, covers the remaining segments of the River (OUs 3 and 4) and the Bay (OU 5). Taken together, the two RODs will require removal of approximately 7.25 million cubic yards of contaminated sediment (containing nearly 30,000 kilograms of PCBs) in the three segments of the River within OUs 1, 3, and 4, and will require a monitored natural recovery program in the other segment of the River and in Green Bay (OUs 2 and 5). In OU 1 alone, the selected remedy calls for dredging and off-Site disposal of approximately 784,000 cubic yards of contaminated sediment at an estimated cost of $61.7 million, as well as associated long term monitoring at an

_____

[3]    See 1997 Memorandum of Agreement Among the Wisconsin Department of Natural Resources, United States Department of the Interior, Menominee Indian Tribe of Wisconsin, Oneida Tribe of Indians of Wisconsin, National Oceanic and Atmospheric Administration, and United States Environmental Protection Agency at 1. The Memorandum of Agreement can be accessed at EPA's Fox River website at http://www.epa.gov/Region5/sites/foxriver/moa.htm. In 2002, the Michigan Department of Attorney General became an additional party to the Memorandum of Agreement.

additional estimated cost of $4.5 million.[4]

The Federal, State, and Tribal natural resource trustees responsible for natural resources at and near the Site (collectively the "Trustees") have taken significant steps to assess the natural resource injuries caused by the PCBs and to recover damages to fund resource restoration and protection activities. For example, the Federal and Tribal Trustees prepared and issued a set of reports estimating the magnitude of the natural resource damages and/or the potential costs of restoration, including an October 2000 Restoration and Compensation Determination Plan (the "RCDP").[5] The RCDP estimated the costs of appropriate restoration work at between $111 million and $268 million to offset present and future losses, plus an additional for $65 million for damages to compensate for past public recreational fishing losses at the Site, bringing the total estimate of damages to between $176 million and $333 million.[6] Finally, in June 2003, the Trustees issued a final "Joint Restoration Plan and Environmental Assessment for the Lower Fox River and Green Bay Area" (the "Restoration Plan").[7] Among other things, the Restoration Plan outlines the Trustees' joint priorities for natural resource restoration and the criteria the Trustees intend to use in selecting and conducting particular restoration projects.

---

[4]    The Remedial Investigation Report, the Feasibility Study, and the two RODs can be accessed at WDNR's Fox River/Green Bay website at http://www.dnr.state.wi.us/org/water/wm/lowerfox/rifs/index.html.

[5]    The RCDP and the related reports can be accessed at the U.S. Fish and Wildlife Service's Fox River/Green Bay website at http://midwest.fws.gov/nrda.

[6]    In November 2000, WDNR issued a series of reports which estimated a lower range of natural resource damages (between $26 million and $176 million). The Trustees have since agreed to use the higher range estimated by the RCDP (between $176 million and $333 million) as a starting point for evaluating early settlements.

[7]    The Restoration Plan can be accessed at the U.S. Fish and Wildlife Service's Fox River/Green Bay website at http://midwest.fws.gov/NEPA/FoxRiver/.

### C. The Complaint and the Consent Decree

The Plaintiffs' Complaint alleges that Defendants P. H. Glatfelter Company ("Glatfelter") and WTM I Company ("WTM") are among the parties legally responsible under CERCLA for PCB contamination at OU 1 at the Site.[8] If approved by the Court, the Consent Decree would conclude this case and would require the Defendants to implement the selected cleanup remedy at OU 1, the critical first phase of PCB cleanup work at the Site. The Defendants would pay for that remedial action work using a specially-dedicated escrow account to be established by the companies. That account would ultimately hold more than $60 million, including $50 million from the Defendants, an additional $10 million available under a prior interim settlement with Appleton Papers Inc. and NCR Corporation, and all interest earned on the money placed in the fund. If that dedicated fund is not sufficient to finance the completion of the work, the Consent Decree reserves the Plaintiffs' rights to require the Defendants to perform or pay for the continuation and completion of the work. The settlement would not resolve the Defendants' potential liability for response activities or response costs relating to areas of the Site other than OU 1.

The proposed Consent Decree also would require the Defendants to pay $3,000,000 for natural resource damages and $1,050,000 as partial reimbursement of past costs incurred by EPA, WDNR, and the U.S. Department of the Interior. The Consent Decree would not resolve

---

[8] Glatfelter and WTM are not the only parties responsible for PCB contamination at the Site. Six of the responsible parties have formed a coalition – known as the Fox River Group – to advocate the companies' viewpoints and to deal collectively with the governments on Fox River/Green Bay cleanup and restoration issues. The members of the Fox River Group are Appleton Papers Inc., Georgia-Pacific Corporation, NCR Corporation, Riverside Paper Corporation, Glatfelter and WTM.

- 7 -

Defendants' potential liability for payment of additional natural resource damages or for additional unreimbursed past costs incurred by the Plaintiffs.

## II.  STANDARD OF REVIEW

### A.      The General Standard of Review for CERCLA Settlements

The well-settled standard of review applied to a proposed government settlement under CERCLA is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes.  United States v. Davis, 261 F.3d 1, 23-28 (1st Cir. 2001); United States v. Akzo Coatings of Amer., Inc., 949 F.2d 1409, 1424, 1426 (6th Cir. 1991); United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990); In re Energy Coop., Inc., 173 B.R. 363, 367 (N.D. Ill. 1994); United States v. Seymour Recycling Corp., 554 F. Supp. 1334, 1337 (S.D. Ind. 1982).  Review of such settlements is committed to the discretion of the reviewing court, see United States v. Hooker Chem. & Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985), which is to exercise that discretion in a limited and deferential manner, Davis, 261 F.3d at 21; Cannons Eng'g, 899 F.2d at 84; In re Cuyahoga Equip. Corp., 980 F.2d 110, 118 (2d Cir. 1992); Akzo Coatings, 949 F.2d at 1424; Donovan v. Robbins, 752 F.2d 1170, 1176-77 (7th Cir. 1984); Metro. Housing Dev. Corp. v. Vill. of Arlington Heights, 616 F.2d 1006, 1014-15 (7th Cir. 1980).

The judicial deference to settlements reached by the parties to CERCLA litigation is "particularly strong" when that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  Akzo Coatings, 949 F.2d at 1436.  Accord Davis, 261 F.3d at 21; Energy Cooperative, 173 B.R. at 367.  Indeed, such settlements deserve "a strong presumption of . . .

- 8 -

validity." United States v. Wallace, 893 F. Supp. 627, 631 (N.D. Tex. 1995). Accord United

States v. Kramer, 19 F. Supp. 2d 273, 285 (D.N.J. 1998); United States v. Rohm & Haas Co.,

721 F. Supp. 666, 681 (D.N.J. 1989). The balance of competing interests affected by a

settlement with the federal government "'must be left, in the first instance, to the discretion of

the Attorney General,'" Thomas Solvent, 717 F. Supp. at 515 (citation omitted), since the

Attorney General retains "considerable discretion in controlling government litigation and in

determining what is in the public interest." United States v. Associated Milk Producers, Inc.,

534 F.2d 113, 117 (8th Cir. 1976).[9]

**B.      Consideration of Comments on the Remedy Selection Decision.**

As noted above, most of the comments on the Consent Decree raise a single issue

concerning the OU 1 cleanup remedy:  they argue that EPA and WDNR should amend the OU 1

ROD to require vitrification of the dredged sediment, rather than allowing for possible disposal

at a landfill located in the Town of Vinland.  A few other comments raise concerns about other

aspects of the selected remedy.  While the Plaintiffs have given those comments full

consideration, as detailed below in Section IV.A, the comments offer no basis for withdrawal

from the Consent Decree.  Consistent with the statute, this was an opportunity for public

---

[9]      An evidentiary hearing is not required in order to evaluate a proposed CERCLA consent
decree.  See United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1085 (1st Cir. 1994)
("requests for evidentiary hearings are, for the most part, routinely denied — and properly so —
at the consent decree stage in environmental cases"); Cannons Eng'g, 899 F.2d at 94
("In general, we believe that evidentiary hearings are not required under CERCLA when a court
is merely deciding whether monetary settlements comprise fair and reasonable vehicles for
disposition of Superfund claims"); United States v. Union Elec. Co., 132 F.3d 422, 430 (8th Cir.
1997) (same); United States v. Laskin, No. C84-2035Y, 1989 WL 140230, at *5 (N.D. Ohio Feb.
27, 1989) (same).  Indeed, requiring an evidentiary hearing would defeat one of Congress's
major purposes in encouraging CERCLA settlements:  the avoidance of time and delay
associated with litigation.  See Charles George Trucking, 34 F.3d at 1085.

Case 2:03-cv-00949-LA      Filed 03/08/04      Page 9 of 26      Document 14

comment on the proposed <u>settlement</u>, not another opportunity for comment on the <u>remedy</u> previously selected by EPA and WDNR.[10]

In cases like this, where the United States proposes to "enter[] into an agreement under [CERCLA Section 122] with any responsible party with respect to remedial action under [CERCLA Section 106]," the statute expressly requires an opportunity for public comment on the settlement. 42 U.S.C. § 9622(d)(1)(A); <u>see id.</u> at § 9622(d)(2)(B). The pertinent provision directs as follows:

> The Attorney General shall provide an opportunity to persons who are not named as parties to the action to comment on the proposed judgment before its entry by the court as a final judgment. The Attorney General shall consider, and file with the court, any written comments, views, or allegations relating to the proposed judgment. The Attorney General may withdraw or withhold its consent to the proposed judgment if the comments, views, and allegations concerning the judgment disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper, or inadequate.

<u>Id.</u> at § 9622(d)(2)(B). In sum, the law requires that the U.S. Department of Justice receive and consider comments to evaluate whether a proposed settlement is "inappropriate, improper, or inadequate." It does not give commenters a right to mount a collateral challenge to an earlier remedy selection decision previously subject to extensive public comment.

None of the parties in this case is seeking judicial review of objections to the selected

---

[10] As required by CERCLA and the NCP, EPA and WDNR afforded multiple opportunities for public input and involvement during the remedy selection process, including several public comment opportunities and more than 20 public meetings and availability sessions. <u>See</u> 42 U.S.C. § 9617; 40 C.F.R. § 300.430(f)(3). In late 2001 and early 2002, the agencies solicited and received extensive public comments on their Proposed Remedial Action Plan and draft Remedial Investigation and Feasibility Study reports for the Site. The agencies addressed those comments in "Responsiveness Summaries" and a series of "White Papers" accompanying the two RODs. Those Responsiveness Summaries and White Papers can be accessed at the WDNR website at http://www.dnr.state.wi.us/org/water/wm/lowerfox/rifs/index.html.

remedy. CERCLA carefully defines when and how that can occur. A formal remedy challenge can only be raised at certain times, by litigants in certain types of judicial actions. See 42 U.S.C. § 9613(h). The commenters in this case are non-parties, however, and their comments do not raise a justiciable challenge to the remedy where all the parties support entry of the Consent Decree.

Even in cases where judicial review of a selected remedy is permitted, CERCLA stringently limits the scope and standard of review. CERCLA Subsection 113(j)(1) provides that "judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record" supporting EPA's remedy selection decision. 42 U.S.C. § 9613(j)(1) (emphasis added). Subsection 113(j)(2) then directs that a reviewing court "shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or not otherwise in accordance with law." Id. at § 9613(j)(2) (emphasis added).[11] For the reasons described above, the court's review should even be more limited and deferential in cases like this where remedy selection issues are only raised by non-party commenters.

### III. THE SETTLEMENT IS FAIR, REASONABLE, AND CONSISTENT WITH THE PURPOSES OF CERCLA

The CERCLA provision governing cleanup settlements like this one directs:

---

[11] One court of appeals has held that Section 113(j)'s judicial review limitations governed a litigant's challenge to a remedy to be performed under a proposed consent decree. Akzo Coatings, 949 F.2d at 1424. In that case, the State of Michigan became a party to the case pursuant to a special CERCLA provision affording states a right to intervene and seek judicial review of a remedy's compliance with state requirements before entry of the consent decree. Id. at 1422. See 42 U.S.C. § 9621(f)(2).

- 11 -

> Whenever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation.

42 U.S.C. § 9622(a). Accord Davis, 261 F.3d at 23 ("CERCLA . . . seeks early settlement with as many [potentially responsible parties] as possible to further expeditious remediation."). This cleanup settlement promotes CERCLA's goals, and it is fair and reasonable for the reasons summarized below.

First and foremost, the settlement would ensure prompt performance of the OU 1 cleanup remedy selected by EPA and WDNR. If the Decree is approved by the Court, the Defendants would be required to remove a large volume of contaminated OU 1 sediment. Removing that source of contamination would, to a significant degree: (i) reduce PCB transport from OU 1 to the downstream portions of the River and Green Bay; (ii) reduce PCB levels in fish and birds in and around OU1; and (iii) reduce human exposure to PCBs from OU 1. Thus, the settlement would be an "effective[] . . . vehicle for cleaning the environment." Davis, 261 F.3d at 26.

Second, the settlement would require the responsible parties (rather than the taxpayers) to fund the cleanup, consistent with CERCLA's liability scheme. It would make them "bear the costs of the harm for which [they are] legally responsible." Cannons Eng'g, 899 F. 2d at 87. Consistent with that goal, the Decree requires a $60 million advance funding commitment for performance of the cleanup work, plus significant additional payments toward natural resource damages and past costs incurred by the government.

Third, the settlement should be viewed as fair and reasonable because it was the product of months of difficult negotiations between the parties, between February and August 2003. The

- 12 -

negotiations with the Defendants were conducted by legal and technical representatives from the government agencies responsible for implementing and enforcing CERCLA, including the U.S. Department of Justice, the Wisconsin Department of Justice, EPA, WDNR, and the Federal, State, and Tribal Trustees.  The settlement was "negotiated at arm's length among experienced counsel," and that fact supports the request that it be approved.  Cannons Eng'g, 899 F. 2d at 87.

Finally, the settlement avoids potentially lengthy and costly litigation.  The Plaintiffs and the Defendants agreed to the terms, and Appendix A to the Decree is a formal resolution documenting the Trustees' support of the settlement.  In addition, none of the other responsible parties commented on or raised any objections to the settlement.  The settlement promotes CERCLA's goals by "reduc[ing] the time and expense of enforcement litigation that necessarily diverts money from cleanup and restoration."  In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1027 (D. Mass. 1989).

## IV.  RESPONSE TO COMMENTS

The Plaintiffs received sixteen comments on the proposed Consent Decree.  The Plaintiffs have identified and categorized the major issues raised by the comments and have prepared joint responses to those issues, as set forth below.[12]

---

[12]    For the Court's convenience, the Plaintiffs have indexed the comments and have numbered all pages of the comments sequentially using the page number prefix "OU 1 COM." Employing that page numbering system, this Brief cites to the specific comments that raised each of the issues discussed below.

- 13 -

**A.      Comments on the OU 1 Cleanup Remedy Selected by EPA and WDNR**

**Comment:**  *Twelve of the sixteen comments object to the cleanup remedy selected by the ROD for OU 1, because it might allow disposal of dredged sediment at a landfill located in the Town of Vinland.  As an alternative to landfill disposal, many of the same comments urge an amendment to the ROD to require sediment vitrification (melting) using an innovative glass furnace technology that was tested at the Site.  (OU 1 COM 004, 005-09, 010-12, 013, 014, 015-16, 017, 018-19, 020-21, 022-24, 025-29, 039-288.)*

**Response:**

The administrative record for the ROD squarely addresses the issue raised by the comments, and the record supports the remedy selected by the ROD.[13]  For that reason, the comments on the remedy do not demonstrate that the Consent Decree "is inappropriate, improper, or inadequate."  42 U.S.C. § 9622(d)(2)(B).

EPA and WDNR selected the OU 1 remedy in accordance with the procedures and remedy selection criteria specified by the NCP.  See generally 40 C.F.R. §§ 300.400-300.440. As part of that process, EPA and WDNR fully considered both vitrification and landfill disposal, as well as other disposal options.  The agencies financed a series of studies on vitrification, including a pilot-scale test of vitrification technology using Fox River sediment that was completed in August 2001.  The agencies' October 2001 Proposed Remedial Action Plan ("PRAP") advanced seven remedial alternatives (including vitrification, as a part of a thermal treatment alternative), but the PRAP identified dredging and landfill disposal as the "proposed

_____

[13]      Complete copies of the administrative record for the OU 1 ROD are housed at EPA's regional office in Chicago and at WDNR's offices in Madison and Green Bay.  The full administrative record is voluminous, and it includes hundreds of documents.  The most significant technical reports in the record are also posted on WDNR's website at http://www.dnr.state.wi.us/org/water/wm/lowerfox.  All technical documents and reports referenced in Section IV.A of this Brief are part of the administrative record supporting the ROD.

- 14 -

alternative" for OU 1.  After considering extensive public comments on the PRAP, the agencies issued a December 2002 Feasibility Study analyzing the relative costs and merits of seven slightly refined remedial options (including vitrification).  Based on that analysis, the December 2002 ROD made dredging and landfill disposal the "selected remedy" for OU 1, although the ROD also discussed the potential advantages and disadvantages of vitrification.

Even after issuing the ROD for OU 1 in December 2002, EPA and WDNR continued to evaluate vitrification for the Record of Decision for OUs 3-5 (issued in June 2003).  As part of that effort, the agencies financed another set of vitrification studies that were published in 2003.

At the same time that they submitted their comments on the Consent Decree, several of the commenters formally petitioned EPA and WDNR to amend the ROD for OU 1 by substituting vitrification for landfill disposal.  The agencies recently answered that request with a "Response to Petition to Amend Record of Decision for Operable Unit 1 and Operable Unit 2 and Supplement to Administrative Records for the December 2002 and June 2003 Records of Decision" (hereinafter the "Petition Response").[14]  The Petition Response summarizes the agencies' original evaluation of the landfill disposal and vitrification options, as detailed in the Feasibility Study and the ROD, and also re-evaluates those options in light of the vitrification studies published in 2003.  As explained in the Petition Response, EPA and WDNR have determined that a ROD amendment is not appropriate at this time because vitrification would be much more expensive, more difficult to implement, and less effective in the short-term than landfill disposal.  In particular, the Petition Response concludes that:

_____

[14]    A copy of the Petition Response is attached as Tab A to the accompanying "Declaration of James Hahnenberg Filed in Support of Plaintiffs' Motion to Enter Consent Decree."

- 15 -

- The most recent cost study on vitrification (published in May 2003) indicates that vitrification would be much more expensive that landfill disposal for OU 1. For OU 1 alone, dredging and vitrification would cost an estimated $93.3 million, as compared to $66.2 million for dredging and landfill disposal.

- Disposal at an appropriate landfill would fully meet all remedy selection criteria established by the NCP, but vitrification would only "partially" meet two of the NCP's nine criteria. EPA and WDNR found that vitrification would only partially meet the NCP's "implementability" criterion, because the technology has only been used on a pilot-scale and has never been applied to a large-scale sediment project. The agencies also classified vitrification as only partially meeting the NCP's "short-term effectiveness" criterion, based on concern about the time it might take to permit and construct a full-scale vitrification facility.

For those reasons, the Petition Response reaffirms the remedy selection decision set forth in the ROD.

The Petition Response addresses the remedy selection issue raised by the commenters, and it demonstrates that the agencies' decision was well-founded. The Court should therefore approve and enter the Consent Decree.

**Comment:** *One comment argues that the ROD should have selected a more stringent cleanup level for PCB-contaminated sediment. The ROD requires removal of sediment with a PCB concentration exceeding 1 part per million ("ppm"), but the commenter advocates removing all sediment exceeding 0.25 ppm PCBs. (OU 1 COM 030-38.)*

**Response:**

EPA and WDNR selected a Remedial Action Level ("RAL") that will require removal of an estimated 784,000 cubic yards of OU 1 sediment with a PCB concentration exceeding 1 ppm. Before selecting that cleanup level, the agencies evaluated a wide range of alternatives, including "no action," 5 ppm, 1 ppm, 0.5 ppm, 0.25 ppm, and 0.125 ppm. See ROD at 84. By definition, a lower RAL would require removal of a higher volume of sediment. For example, the agencies' Feasibility Study estimated that a 0.25 ppm RAL would require removal of approximately 1,323,000 cubic yards of sediment – i.e., the 784,000 cubic yards above 1 ppm, plus an

- 16 -

additional 539,000 cubic yards with PCB content between 0.25 ppm and 1 ppm. As summarized below, EPA and WDNR determined that a RAL lower than 1 ppm was not justified under the NCP remedy selection criteria because it would only yield minor incremental environmental benefits, it would be more difficult to implement and less effective in the short-term, and it would not be cost effective.

The NCP requires that remedial alternatives "shall be assessed to determine whether they can adequately protect human health and the environment." 40 C.F.R. § 300.430(e)(9)(iii)(A). To fulfill that mandate, the agencies judged each RAL option based on its ability to achieve several "Remedial Action Objectives" identified by the ROD. See ROD at 50-51, 84-88. For example, one Remedial Action Objective focused on the need to "protect human health by targeting removal of fish consumption advisories as quickly as possible." ROD at 51. For all the Remedial Action Objectives, the 1 ppm RAL option showed a clear advantage over the less stringent RAL options ("no action" and 5 ppm), but the more stringent options (0.5 ppm, 0.25 ppm and 0.125 ppm) offered little or no added benefit.

The following chart from the ROD helps illustrate that point. PCB levels in OU 1 walleye would be comparably reduced with the 1 ppm RAL specified by the ROD or the 0.25 ppm RAL advocated by the commenter; in either case, acceptable fish tissue levels would be achieved within one year after remedy completion.



## Time to Achieve Acceptable Fish Tissue Levels for OU 1

Years — Potential Remedial Action Levels

51    29    <1    <1    <1    <1

Legend: ■ No Action  ■ 5 ppm  □ 1 ppm  ▨ 0.5 ppm  ▤ 0.25 ppm  ■ 0.125 ppm

ROD at 87.  As noted in the ROD, "limited risk reduction [would be] achieved by selecting a RAL of less than 1 ppm" and the Remedial Action Objectives "would not necessarily be achieved sooner."  ROD at 84, 86.

In selecting a RAL, EPA and WDNR also were required to balance the environmental benefits of each RAL option against other NCP remedy selection criteria, including "implementability," short-term effectiveness, and cost.  See 40 C.F.R. § 300.430(e)(9)(iii)(E), (F), (G).  The agencies concluded that the disadvantages of a RAL lower than 1 ppm far outweighed the marginal environmental benefits.  As noted above, a 0.25 ppm RAL would require removal of a relatively large additional volume of sediment with a relatively low PCB content (539,000 cubic yards with PCB content between 0.25 ppm and 1 ppm).  To manage that additional sediment with low-level contamination, there would need to be more dredging, more

- 18 -

truck traffic, and more landfill space. The overall remedy for OU 1 would take longer to complete, and the benefits of the cleanup would be delayed. The cost would also be much higher. For example, the agencies' Feasibility Study estimated the cost of the selected remedy (with a 1 ppm RAL) at $66.2 million, as compared to $102.5 million for a 0.25 ppm RAL.

The administrative record provides ample support for the agencies' conclusion that a 1 ppm RAL would achieve environmental cleanup goals "within a reasonable timeframe relative to the anticipated costs." ROD at 84. The record also demonstrates that the 0.25 ppm RAL option was past the point of diminishing return for reducing risk to human health and the environment, and had distinct disadvantages, including a much higher cost.

> **Comment:** *Two comments contend that PCB-contaminated sediment should be left in place, rather than being dredged, due to concern that PCBs may be re-suspended during dredging. (OU 1 COM 001, 003.)*

> **Response:**

In addition to evaluating dredging and other active sediment remediation options, EPA and WDNR fully considered "No Action" and "Monitored Natural Recovery" alternatives for OU 1. The agencies ultimately determined that those alternatives would not achieve acceptable reductions in risk to human health and the environment, as explained by the following excerpt from the ROD:

> The No Action and [Monitored Natural Recovery] alternatives do not produce reduction in human risk and exposure in the foreseeable future, unlike active engineering controls. Additionally, fish consumption surveys indicate that 50 percent of anglers do not follow fish advisories. Therefore, existing institutional controls do not adequately reduce human exposure to PCBs from consumption of contaminated fish. In addition, institutional controls are not protective for ecological receptors (e.g., the birds, mammals and fish). Given the survey data, it is unlikely that sole reliance on these types of controls would be reliable in the long term to ensure human health and ecological protection.

- 19 -

ROD at 65.

The ROD also answered concerns that had been raised regarding potential releases of

PCBs during dredging:

> As successfully shown during the Lower Fox River demonstration
> dredging projects, environmental releases will be minimized during
> remediation by (1) treating water prior to discharge; (2) controlling storm
> water run-on and runoff from staging and work areas; and (3) utilizing
> removal techniques that minimize losses; as well as through (4) the
> possible use of silt curtains where necessary to reduce the potential
> downstream transport of PCBs.

ROD at 69. The demonstration projects referenced in the ROD involved full-scale dredging in

two of the most highly-contaminated areas of the River. See ROD at 6-9. Those projects helped

show that dredging at the Site can be done safely and effectively using the techniques described

in the ROD.

The agencies' decision to require dredging as part of the selected remedy for OU 1 is

supported by the administrative record. Again, the comments on the remedy provide no basis for

disapproving the Consent Decree.

**B.    Other Comments**

**Comment:** *Two comments argue that the $60 million advance commitment of funds
under the settlement may be insufficient, and those comments demand a greater
commitment by the companies. (OU 1 COM 002, 030-38.)*

**Response:**

As recited by Paragraph 96 of the Consent Decree, "the Parties currently anticipate that

the [$60 million] to be deposited in the Escrow Account . . . (together with the interest earned on

- 20 -

such deposits) will be sufficient to fund the completion of the Response Work . . . ."[15]  From the

Plaintiffs' perspective, that advance funding commitment is a major benefit of the settlement,

because it provides financial assurance for performance of the required cleanup work.  But the

Consent Decree also reserves the Plaintiffs' rights to require additional work by the Defendants

even if the costs of the cleanup exceed the advance funding commitment.  Thus, the Consent

Decree adequately protects the public interest in ensuring a complete cleanup.

> **Comment:**  *One comment asserts that the Consent Decree should require a larger payment for natural resource damages.  The same comment demands greater opportunities for public involvement in the selection of natural resource restoration projects.  (OU 1 COM 030-38.)*

**Response:**

The Consent Decree requires that the Defendants make a $3,000,000 payment toward

natural resource damages, but it does not provide any corresponding release from liability.  The

Plaintiffs negotiated that "downpayment" arrangement because this settlement only covers part

of the Site.  In fact, the great majority of the natural resource damages at the Site are attributable

to contamination in Green Bay (OU 5), an area not even addressed by this settlement.  Since the

Settling Defendants are not released from liability for natural resource damages, the Consent

Decree adequately protects the public interest in recovery of such damages.

The Trustees' Restoration Plan defines the criteria and process that the Trustees will use

---

[15]    As indicated above, the ROD estimates the cost of dredging, disposal, and related "remedial action" work at $61.7 million, plus an additional $4.5 million for long term monitoring, yielding a total estimated cost of $66.2 million.  Under the Decree, the remedial action work would be financed with the $60 million deposited in the dedicated escrow account (plus interest).  See Consent Decree Section VI.  After completion of the remedial action, the escrow account could be closed, and the Defendants would pay the costs of long-term monitoring directly.  See Consent Decree Section VIII.

Case 2:03-cv-00949-LA     Filed 03/08/04     Page 21 of 26     Document 14

in selecting particular natural resource restoration projects. The Trustees solicited and received public comment before finalizing the Restoration Plan. <u>See</u> 67 Fed. Reg. 59073 (Sept. 19, 2002) (notice soliciting public comment on the draft Restoration Plan); 68 Fed. Reg. 43741 (July 24, 2003) (notice of release of final Restoration Plan). The comment's demand for greater public involvement in restoration project selection has no bearing on the Consent Decree because the Decree does not deal with the details of project selection. Consistent with the CERCLA and the governing regulations, the Decree simply requires that the Trustees use the $3,000,000 recovery for "restoration, rehabilitation, or replacement of injured natural resources at the Site, and/or acquisition of equivalent resources . . . ." Consent Decree ¶ 49. <u>See</u> 42 U.S.C. § 9607(f)(1) (requiring that trustees use recoveries "only to restore, replace, or acquire the equivalent of [the injured] resources"); <u>see</u> <u>also</u> 43 C.F.R. Part 11.

The settlement's natural resource damages component will provide a significant source of funding for the Trustees' restoration efforts. The comment on that aspect of the settlement provides no basis for disapproving the Decree.

**Comment:** *One comment argues that the settlement is premature because the remedial design is not yet completed, and because the costs remain uncertain. (OU 1 COM 030-38.)*

**Response:**

As recognized by the text of CERCLA, cleanup agreements with responsible parties can "expedite effective remedial actions and minimize litigation." 42 U.S.C. § 9622(a). Thus, in cases like this, the United States routinely attempts to negotiate an agreement requiring the responsible parties to finance and perform both the remedial design and the remedial action. To streamline such negotiations, EPA and the U.S. Department of Justice for many years have used

- 22 -

a "model" consent decree for remedial design/remedial action. See 56 Fed. Reg. 30996 (July 8, 1991) (publishing interim model decree); 60 Fed. Reg. 38817 (July 28, 1995) (announcing comprehensive revisions to the model decree); 63 Fed. Reg. 9541 (Feb. 25, 1998) (announcing further revisions). By definition, a remedial design/remedial action settlement normally is reached before the remedial design has even begun – because the decree itself requires performance of that work – and before the parties know the ultimate cost of the cleanup.

Here, the remedial design work has already begun under a July 2003 agreement with WTM I Company. See Consent Decree Appendix F. The remedial action work is scheduled to begin this summer. Given that timing, the settlement certainly is not premature, and the Decree should be approved.

## CONCLUSION

The public comments have not altered the Plaintiffs' conclusion that the Consent Decree is fair, reasonable, and consistent with the purposes of CERCLA. The settlement would require extensive cleanup work at OU 1, starting this summer. The settlement would reimburse an appropriate portion of certain CERCLA response costs and natural resource damage assessment costs incurred by the United States, and would provide funds for important natural resource restoration work in the Fox River/Green Bay area. For those reasons, the Court should approve and enter the Consent Decree.

Respectfully submitted,

For the United States of America

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division

Date:  March 8, 2004                        S/ Randall M. Stone
                                            RANDALL M. STONE, Trial Attorney
                                            JEFFREY A. SPECTOR, Trial Attorney
                                            Environmental Enforcement Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 7611
                                            Washington, DC   20044-7611
                                            Phone:        (202) 514-1308
                                            Facsimile:    (202) 616-6584
                                            E-Mail:        RANDALL.STONE@USDOJ.GOV

                                            STEVEN M. BISKUPIC
                                            United States Attorney

                                            MATTHEW V. RICHMOND
                                            Assistant United States Attorney
                                            Eastern District of Wisconsin
                                            U.S. Courthouse and Federal Building - Room 530
                                            517 E. Wisconsin Avenue
                                            Milwaukee, WI   53202

- 24 -

For the State of Wisconsin

Jerry L. Hancock
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53702
(608) 266-1221

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

William H. Harbeck – Counsel for Defendant WTM I Company
David G. Mandelbaum – Counsel for Defendant P. H. Glatfelter Company
Matthew V. Richmond – Counsel for the United States

In addition, I hereby certify that the foregoing was mailed on this date by first-class mail, postage prepaid, to the following non-ECF participants:

Nancy K. Peterson
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202-4497

J.P. Causey Jr.
Vice President & Corporate Secretary
WTM I Company
c/o Chesapeake Corporation
1021 E. Cary Street - Box 2350
Richmond, VA 23218-2350

Patrick H. Zaepfel
Environmental Counsel
Glatfelter
96 South George Street, Suite 500
York, PA 17401

Jerry L. Hancock
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Peggy Schneider
Oneida Law Office
P.O. Box 109
Oneida, WI 54155

Mercedes Swimmer
Program Attorney
Menominee Tribal Offices
P.O. Box 910
Keshena, WI 54135

John Carlucci
Office of the Solicitor
U.S. Department of the Interior
1849 C Street N.W. - Rm 6553
Washington, DC 20240

Peter Felitti
Associate Regional Counsel (C-14J)
U.S. Environmental Protection Agency
77 W. Jackson Blvd.
Chicago, IL 60604

Douglas P. Dixon
U.S. Environmental Protection Agency
Ariel Rios Building - Mail Code 2272A
1200 Pennsylvania Avenue, N. W.
Washington, DC 20460

Marguerite Matera
Office of General Counsel
National Oceanic and Atmospheric Administration
1 Blackburn Drive – Suite 205
Gloucester, MA 01930

Kathleen L. Cavanaugh
Assistant Attorney General
5th Floor, South Tower
Constitution Hall
525 West Allegan Street
Lansing, MI 48933

Dated:    March 8, 2004                    S/ Randall M. Stone
                                           Counsel for the United States