UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF WISCONSIN<br><br>Plaintiffs,<br><br>v.<br><br>P. H. GLATFELTER COMPANY and WTM I COMPANY (f/k/a Wisconsin Tissue Mills Inc.),<br><br>Defendants. | CIVIL ACTION NO. 03-C-0949<br><br>The Honorable Lynn Adelman |

**VOLUME 1 OF 6**

**APPENDIX OF PUBLIC COMMENTS ON "CONSENT DECREE FOR REMEDIAL DESIGN AND REMEDIAL ACTION AT OPERABLE UNIT 1 OF THE LOWER FOX RIVER AND GREEN BAY SITE"**

Respectfully submitted,

For the United States of America

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division

Date: March 8, 2004


S/ Randall M. Stone
RANDALL M. STONE, Trial Attorney
JEFFREY A. SPECTOR, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 514-1308
Facsimile: (202) 616-6584
E-Mail: RANDALL.STONE@USDOJ.GOV

INDEX OF PUBLIC COMMENTS

VOLUME 1 OF 6


| Comment Set | Commenter | Page Range |
|---|---|---|
| 1. | Greg Laabs | OU 1 COM 001 |
| 2. | Geraldine S. Jay | OU 1 COM 002 |
| 3. | Nora Schaeffer | OU 1 COM 003 |
| 4. | Anonymous | OU 1 COM 004 |
| 5. | Donna Lohry | OU 1 COM 005-09 |
| 6. | Roy J. Erdmann | OU 1 COM 010-012 |
| 7. | Delano E. Zimmerman | OU 1 COM 013 |
| 8. | Joseph and Mary Kuehnl | OU 1 COM 014 |
| 9. | Delano E. Zimmerman | OU 1 COM 015-016 |
| 10. | Ricky Socha | OU 1 COM 017 |
| 11. | Town of Neenah | OU 1 COM 018-19 |
| 12. | Peter J. Gloede | OU 1 COM 020-21 |
| 13. | Thomas H. Galow | OU 1 COM 022-24 |
| 14. | Jeanne and Dennis Luebke | OU 1 COM 025-29 |
| 15. | Clean Water Action Council of Northeast Wisconsin, Inc. | OU 1 COM 030-38 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

William H. Harbeck – Counsel for Defendant WTM I Company
David G. Mandelbaum – Counsel for Defendant P. H. Glatfelter Company
Matthew V. Richmond – Counsel for the United States

In addition, I hereby certify that the foregoing was mailed on this date by first-class mail, postage prepaid, to the following non-ECF participants:

Nancy K. Peterson
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202-4497

J.P. Causey Jr.
Vice President & Corporate Secretary
WTM I Company
c/o Chesapeake Corporation
1021 E. Cary Street - Box 2350
Richmond, VA 23218-2350

Patrick H. Zaepfel
Environmental Counsel
Glatfelter
96 South George Street, Suite 500
York, PA 17401

Jerry L. Hancock
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Peggy Schneider
Oneida Law Office
P.O. Box 109
Oneida, WI 54155

Mercedes Swimmer
Program Attorney
Menominee Tribal Offices
P.O. Box 910
Keshena, WI 54135

John Carlucci
Office of the Solicitor
U.S. Department of the Interior
1849 C Street N.W. - Rm 6553
Washington, DC 20240

Peter Felitti
Associate Regional Counsel (C-14J)
U.S. Environmental Protection Agency
77 W. Jackson Blvd.
Chicago, IL 60604

Douglas P. Dixon
U.S. Environmental Protection Agency
Ariel Rios Building - Mail Code 2272A
1200 Pennsylvania Avenue, N. W.
Washington, DC 20460

Marguerite Matera
Office of General Counsel
National Oceanic and Atmospheric Administration
1 Blackburn Drive – Suite 205
Gloucester, MA 01930

Kathleen L. Cavanaugh
Assistant Attorney General
5th Floor, South Tower
Constitution Hall
525 West Allegan Street
Lansing, MI 48933

Dated: March 8, 2004

S/ Randall M. Stone
Counsel for the United States

Stone

Greg Laabs
805 W. Grant
Appleton, WI 54914

Assistant Attorney General
Environment & Natural Resources Division
PO Box 7611
US Department of Justice
Washington, DC 20044-7611
Oct. 29, 03

Re: United States & the State of WI v. P.H. Glatfelter Co. & WTM 1 Company, Civil Action No. 03-C-999 (E.D. WI) & D.J. Ref. 90-11-2-1045/2

Dear Judge

Thank you for an opportunity to comment on the proposed disastrous clean-up of Little Lake Butte des Morts, at Menasha, WI.

The material intended to be cleaned out of the river has been there for a long time. God and Mother Nature have done a fantastic job of healing the lake. We can all be sure that the proposed clean-up cost will fall way short of projections, and the financial burden on the companies involved will only cause more jobs to be lost, and more of our already troubled tax base will disappear.

Disturbing the lake bottom will cause the material in question to be stirred up, and not properly removed, thereby causing nature to have to start all over again to heal the lake. If the material were to be removed, as bad as that material is, it would have to be transported to another part of the Earth, and have the potential to cause an environmental problem there. Clearly the best solution to a bad situation is to leave the material right where it is, at the bottom of the lake, where the repair of the lake bottom is already well under way.

Your sensible, practical, and logical decision to let the lake continue to repair itself, will be greatly appreciated by me, and all of the people of the Fox River Valley that have the faculties to realize that this is the right thing to do, both environmentally and financially.

Thank you for making the right decision.

Yours truly

Greg Laabs

Greg Laabs

90112104 5/2

DEPARTMENT OF JUSTICE
NOV 7 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 001

Stano

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, D.C. 20044-7611

Dear Sir:

Relative to the consent decree, the United States and the State of Wisconsin v. P.H.Glatfelder Company and WTM 1 Company, Civil Action No. 03-C-999 (E.D. Wis.) And D.J. Ref.90-11-2-1045/2, I feel strongly that there is insufficient funding being offered by the paper companies to do a thorough job of removing the offending PBCs. This has been an ongoing battle on the part of the citizens of the Fox River Valley to insure a meaningful cleanup of the Fox River for the use of future generations.

I urge you to consider the long-term implications of the consent decree as it now stands and support a more generous contribution on the part of those accepting responsibility.

Sincerely,

Geraldine S. Jay

Geraldine S. Jay
3176 West Fairview Road
Neenah, WI 54956

90-11-2-1045/2

DEPARTMENT OF JUSTICE
NOV 12 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 002

Stone

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington D.C. 20044-7611
Ref: U.S. & State of WI vs P.H. Glatfelter Co. & WTM1 Co.
Civil Action No. 03-C-999 (E.D. Wis.)
D.J. Ref.90-11-2-1045/2

November 5, 2003

Dear A.A.G.
I am one of approximately 200 people being permanently laid off from my job at Glatfelter (Paper Mill) in Neenah. My last day of work is Dec. 2, this year. Glatfelter has agreed to throw $25 million towards the Fox River Clean-up. Tho the Company denies the lay-offs have anything to do with this. I think it does. I'm out of a job that I loved, but that's beside the point.

It seems to me that dredging up all of these PCB's at this time is wrong. Mother Nature has been remedying the problem by naturally capping the sediment for over 20 years. If anything, we should be looking at adding more clean soil to this capping process.

I have not seen anything written to document the success of dredging. How can anyone possibly "catch" all of these PCB's? The "ones that get away" are going to be floating around contaminating the water until we're right where we started 20 years from now! And to put them in a landfill to contaminate another soil is ludicrous.

I also think that if any money is to be spent on this, every man, woman and child living in the area should pay equal parts toward a solution, as the Fox Valley would not be where it is today without the paper mills. Everyone enjoying the quality of life they have here should contribute.

I completely believe this dredging is wrong for the River and the Future.

Sincerely,
Nora Schaeffer
Nora Schaeffer
W2257 County Road J
Kaukauna, WI 54130

90112104512

DEPARTMENT OF JUSTICE
NOV 12 2003
ENRD DIVISION
ENFORCEMENT RECORDS

OU1 COM 003

U.S. and state of Wisconsin vs. Glatfelter Co.

Stone

To whom it may concern,
I'm writing in response to the poison in the fox river.
Why shift it from one place to another when it can be destroyed and made into a useful material.
Glatfelter is closing shop to many members of our community which will cause a chain reaction to our economy. It's my belief that the reason for this is to show the community that it's everybody's responsibility what lies in the river ;since in around about way it is.
The money the employees made was dispersed through out buying new cars, new homes ,food ,goods and toys, toys ,toys.
The way I see it we may as well give to them good just as they plan to give it to the community good. Maybe it may even create a few badly needed jobs. Let's do it right and if Glatfelter goes broke. OH WELL, He will not starve.

DEPARTMENT OF JUSTICE
NOV 12 2003
ENRD DIVISION
ENFORCEMENT RECORDS

90-11-2-07135/2

OU1 COM 004

STOVE

Donna Lohrey
511 West Bent Ave.
Oshkosh, WI. 54901
1-920-235-8553
Nov. 13, 2003

Honorable Attorney General
Environment and Natural Resources Division,
U.S. Department of Justice,
P.O. Box 7611
Washington, D.C 20044-7611

Reference: Disposal of Polychlorinated biphenyls (PCBs) from the Fox River, in North East Wisconsin.

Your Honor,

As you know, our river has been contaminated by PCBs sense 1950, and the problem of heath hazard has given rise to untold amounts of concern and study.

The Fox River in Wisconsin runs North, and empties into the bay of Green Bay.

OU1 COM 005



90-11-2-1045/1

and flows in natural currents into Lake Michigan down to the drinking water of Milwaukee, south to Chicago. Making stops along the way to supply drinking water to at least 28 million people.

The problem here is no small matter, and all communities along the way are aware in one degree or another.

To compound the issue, is the fact that these PCBs, if left in the sludge state they are now in, will be a toxic danger until infinity, no matter where stored.

The local news paper Oshkosh Northwestern 10-20-2003 quotes Bruce Baker, deputy administrator for the Wisconsin DNR's division of water quality as saying "The landfill is a very safe disposal method for PCBs sediments."

This is a false statement. Winnebago County Wisconsin did accept low levels of PCBs into the local land fill, and considered accepting higher levels in the last dredging, but through a through study and education

the citizens refused to allow the landfill to take any higher grade than the low level, and the main dredgings were shipped out to a toxic landfill in another state, I believe Michigan. Time will tell the safety of that site.

To my understanding Brown County Wisconsin then arranged, and did build a toxic landfill to accept the next clean up. However it is common knowledge that no landfill, no matter how well constructed can guarantee the safty of this toxic material over time, and in time it will, without a doubt become a health hazard again to another generation.

Realizing this the residents of the proposed site in the Green Bay area are solidly opposed to the PCBs being stored there.

This is a hot potatoe which no responsible Community wants to deal with. They have good reason!

According to The Oshkosh Northwestern (09-16-03) there is now technogoly which

can render the PCB sterile, by way of high degree of heat which will destroy 99.999 % of the PCBs and render them into a glass aggregate of harmless material which has been deminstrated to be a usable substance in the making of black top (asphalt). Minergy Corporation of Neenah, Wisconsin and the Wisconsin Department of Transportation are fully up to date on this process.

As you review this long lasting, complex issue, it now appears to me and other like minded individuals; that all people concerned with the health and safty of the public, now and in the future, would agree this heat process is the way to go in rendering a toxic substance into a safe one.

Now to the cost. The public is told the cost will be more. I'm not aware of the factual amount, but it would appear to me that if the PCBs can be dredged, and now recycled into a useful product, the cost of disposal would be defrayed.

In its last vote on the matter (10-2003) the Winnebago County Board of Supervisors voted not to allow any further landfill of PCBs.
Brown County residents also do not want them, even in a toxic landfill site.

The health and safty of people in excess of 28 million waits your decision.

It would appear to me, that if we as a people can support exploration of outer space, we can also provide for the safty of our land and water ways.

I strongly appeal, that you grant these most toxic materials be rendered harmless by means of vitrification.

Respectfully Yours,
Donna Lohry.
Donna Lohry, Executive Boardmember
Winnebago Audubon Society.

Copies to: Editor – Oshkosh Northwestern, Green Bay Press Gazette, Milwaukee Journal-Sentinel.

Wednesday, November 5, 2003
Stowe

To: the Assistant Attorney General of the Environment and Natural Resources Division
Civil Action No. 03-C-999(E.D. Wis.) + D.J. Ref. 90-11-2-1045/2
Re: United States and the State of Wisconsin vs. P.H. Glatfelter and WTM 1 Company

My husband (Roy J. Erdmann) and I (Deborah S. Erdmann) are responding to the ~~D~~ Consent Decree in the above case of United States + the State of Wisconsin vs. P.H. Glatfelter + WTM1.

We have no problem with how the paper companies pay for and dredge up the PCB sludge from the Fox River in Wisconsin. We agree the PCBs should be cleaned up for this generation + generations to come, so they can enjoy the use of the river. We do think though by dredging (vacuuming) the river bottom, they'll be recontaminating the water. (We've seen people vacuuming the sediment when excavating for treasures in the oceans, etc. The silt just billows around in the water.) How is the water going to be purified of PCBs? Also they are not totally getting rid of PCBs. They're going so many feet from shore + also aren't touching the weed beds and cattails. Is that really solving it?

The problem we have is the disposal of the PCB filled sludge. The landfill they want to use is owned by Georgia-Pacific Paper Co. + is in our township (Town of Vinland, Winnebago County in Wisconsin). It is right next to our property (which there is only an acre in between). We feel that it should be burned (which is known as vitrification) by Minergy Corp. in Neenah, Wisconsin. Vitrification gets rid of 99.999% of the PCBs and other toxins. Also the end product can be recycled into road construction material. The problem would be gone forever. It won't be if you put the PCBs in the landfills. The PCBs last 500 years or more. Who knows when the landfill is going to leak. It's made by humans + isn't 100% guaranteed. The paper companies are only responsible for the landfills for 40 years. Who will take care of it then?

We are asking you to delay the consent decree. One reason is the Vinland town board + the people of the township were not notified of the public meeting of how the PCBs were going to be disposed of. The EPA, DNR + Justice Dept. said it was (the decision to landfill) decided in May of 2003. We (the township) didn't have a meeting with Georgia-Pacific (the paper company that offered their landfill in our township for the disposal of the PCBs) until Wednesday May 14, 2003. There was no mention of dumping PCB sludge! Georgia-Pacific just talked of reopening + disposing of paper sludge + paper ash. Putting PCBs in the landfill is breaking the contract between the township + the paper company. It was supposed to be paper sludge + paper ash only.

We just don't feel like we were properly informed of a public meeting for the disposal of PCBs. My husband + I think the Record of Decision should be amended for more public opinion + so Minergy Corp. can present their facts + figures fairly. We think we were robbed of that right.

We think everybody is trying to rush this now because they might lose the money from the paper companies. They're responsible for this mess. Nobody (the public) didn't ask or demand that they make carbon-less paper (which contains PCBs). The companies should pay no matter what!

It might cost a little more + take a couple years longer to process the sludge through Minergy Corp. It's only going to take 1 year to build the furnace needed to burn the sludge. But we think it's worth it. It's a small price to pay for a job that will totally destroy the PCBs. It took almost 20 years to dump it all in the river + it's been sitting in the Fox River for 30 years. What's the rush now? We don't want people to have to deal with the PCBs in the land fill again somewhere down the road. As far as the money, they could stick some of the payment money from the paper companies into an account + earn some interest to help pay for the extra expense.

We want to thank you for taking the time to read our letter. This is a very important matter, not just for us, but every body in Winnebago County + generations to come.

(Erdmann letter - page 2)

OU1 COM 011

(Erdmann letter page3)

Sincerely,

Roy J Erdmann 11/05/03
(Roy J ERDMANN)

Deborah S. Erdmann 11/05/03
(Deborah S. Erdmann)

Address: Roy & Deborah Erdmann
3073 County Road G
Neenah, WI 54956

Phone: 1-920-836-2383



Stono

Delano E. Zimmerman
1467 Cowling Bay Road
Neenah WI 54956-9205
November 4, 2003

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC, 20044-7611

Refer: United States and the State of Wisconsin v. P.H. Glatfelter Company and WTM 1 Company, Civil Action No..03-C-999 (E.D. Wis.) and D. J. Ref. 90-11-2-1045/2

Dear Assistant Attorney General:

I would like the Judge in this matter to be aware that the Record of Decision was made on evidence that was gathered in 1999 and the Consent Decree should not be honored until a Record of Decision consistent with current evidence and technology and cost is formulated.

The current Record of Decision mandates a landfill placement of PCB material. Current technology and resources are available in our area through Minergy, Inc., a subsidiary of Wisconsin Electric, Inc., which will incinerate these PCB's and completely destroy them at a cost comparable or lower than that under the current Consent Decree and that originally determined for the Record of Decision.

If there are any questions, do not hesitate to call or write.

Yours truly,

Delano E. Zimmerman

Delano E. Zimmerman
Phone: (920) 729-1904
E-mail: dzimmer159@aol.com

90-11-2-1045/2

DEPARTMENT OF JUSTICE
NOV 12 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 013

Stone

November 10, 2003

Assistant Attorney General
Environmental and natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, D.C. 20044-7611

Reference: United States and the State of Wisconsin vs. P.H. Gladfelter Company and WTM 1 Company, Civil Action No. 03-C-999 (E.D. Wisconsin) and D.J. Ref. 90-11-2-1045/2.

Dear Assistant Attorney General;

Sixty-two million dollars has been determined to be the amount of money needed to clean up the Little Lake Butte Des Morts and part of the Fox River of PCB's and other contaminants. While we are not opposed to the clean-up, we ask that the Consent Decree be amended to include the monies needed to finance the vitrification process to rid PCB's permanently.

If the companies are allowed to take the landfill option as a cheaper method, future citizens and taxpayers will only have to deal with the matter in the future, but at a deadly and more expensive cost.

Please delay the Consent Decree until Neenah Minergy can finalize their proposal on the projected costs and process, with timeframes. The P.H. Gladfelter Company and WTM 1. Company wants to push the Consent Decree without having the Federal Government consider the vitrification process.

Citizens at large were never informed of the Consent Decree and the ramifications on the disposal until recently.

Please delay the approval of the Consent Decree to include the projected vitrification process through Neenah Minergy. The EPA also favors the vitrification process as a permanent solution to the disposal of PCB's.

Thank you.

Sincerely,

Joseph Kuehnl Mary Kuehnl

90-11-2-1045/2

Joseph and Mary Kuehnl
6767 County T
Oshkosh, WI. 54904

DEPARTMENT OF JUSTICE
NOV 14 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 014



PLSt

STONG
EE
ENRD

Delano E. Zimmerman
1467 Cowling Bay Road
Neenah WI 54956-9205
November 4, 2003

Attorney General John Ashcroft
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Refer: United States and the State of Wisconsin v. P.H. Glatfelter Company and WTM 1 Company, Civil Action No..03-C-999 (E.D. Wis.) and D. J. Ref. 90-11-2-1045/2

Dear Attorney General:

I would like the Judge in this matter to be aware that the Record of Decision was made on evidence that was gathered in 1999 and the Consent Decree should not be honored until a Record of Decision consistent with current evidence and technology and cost is formulated.

The current Record of Decision mandates a landfill placement of PCB material. Current technology and resources are available in our area through Minergy, Inc., a subsidiary of Wisconsin Electric, Inc., which will incinerate these PCB's and completely destroy them at a cost comparable or lower than that under the current Consent Decree and that originally determined for the Record of Decision.

It does not make sense to continue to "Landfill" permanently toxic materials in any area when there is a safe disposal process available.

If there are any questions, do not hesitate to call or write.

Yours truly,

Delano E. Zimmerman

Delano E. Zimmerman
Phone: (920) 729-1904
E-mail: dzimmer159@aol.com

P.S. Enclosed find Minergy's Home page.

DEZ

DEC 16 2003

OU1 COM 015



90-11-2-1045/2






## Minergy Corporation

**specializes in the vitrification (ie, melting) of wastes such as sludges, sediments and soils, into an inert construction glass called Glass Aggregate.** Glass Aggregate is formed by melting and then quench-cooling the minerals contained in the waste. The melting process destroys any organic contaminants and permanently stabilizes trace metals in the ceramic matrix of the vitreous product. **Minergy** is an industry leader in the waste vitrification with successful commercialization of several systems. New applications are investigated and developed on a regular basis.

OU1 COM 016

McNulty

11-15-03

Your Honor:

This is in reference to a decree you will soon be involved in, the United States and the state of Wisconsin v.P.H. Glatfelter Co. and WTM I Co., Civil Action No. (E.D. Wis.) and D.J. Ref.90-11-2-1045/2.

First of all, I apologize for not knowing your name. I'm writing to you concerning the challenging task of dredging an estimated 784,000 cubic yards of (PCB) contaminated sediment which is now in the bottom of the Fox River, in the State of Wisconsin.

We all agree the river should be cleaned up, not only because of the environmental damage alone, but this chemical is a known carcinogen, and the fact the Fox river is considered a Federal Super Fund Site.

All parties involved meaning the E.P.A .the WI. D.N.R. the thousands of citizens and Dairy farmers living and working in this area. Unfortunately the U.S. Environmental Protection Agency, and the Wisconsin Department of Natural Resources want to build not only the states largest landfill, but a hazardous contaminated waist landfill, and dump this horrible chemical in the ground.

The hard part to understand is P.C.B.s last forever, they don't break down over time. We have a company located right next to the dredging site, that has the (PROVEN TECHNOLOGY) to break this manmade chemical down to a useable product, which is 100% P.C.B. FREE! and safe.

The only advantage to our government plan is time. Because of the large amount of sludge to destroy, this company called Minergy, would need to construct a larger plant to handle this.
By the time the land filling would start or construction on the proposed Minergy addition is less then one year, and the costs are only several million dollars apart.

The money issue is questionable because at the last few town meetings, Minergy submitted bids to the E.P.A. and the WI. D.N.R. based on the information provided to them, and the paper mills involved who deliberately discharged this and many other chemicals into our river system, 30-40 years ago?
Minergy successfully built and tested a pilot plant just for Vitrification of P.C.B.s (AND IT WORKS), the last cost estimates came in 4% less.

Now that more information is available Minergy is leaning towards the cost of Vitrification could be about the same or even less then the land filling option, the P.C.B. problem would gone forever for everyone.

Your Honor I know Judge's are smart people, I'm urging you to study this issue carefully and approve the Vitrification process. Please don't allow these government agency's and Paper Mills dump this poison in my backyard or anyone's plus take the huge risk of contaminating our wells and destroy our environment our landscape, our livelyhoods.

Remember this would be faster to just dig a hole in the ground , dump in the contaminates and look the other way. Vitrification would take a year or two longer but then the problem would be over forever, I trust you will make the correct decision and who polluted our environment in the first place, hold them responsible.

Respectfully: Ricky Socha

Ricky Socha

90-11-2-1049/1

DEPARTMENT OF JUSTICE

NOV 20 2003

LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 017



# TOWN OF NEENAH
## Winnebago County
## 1648 South Park Avenue, Neenah, Wisconsin 54956

Steven J. Spanbauer, Chairman 920-722-6205
Jan DeKeyser, Supervisor 920-725-3284
Glenn Armstrong, Supervisor 920-722-3355
Dennis Briggs, Supervisor 920-722-3619
Glenn Winkler, Supervisor 920-722-2289
Carita Williams, Clerk/Treasurer 920-725-0916

October 29, 2003

Assistant Attorney General
Environment & Natural Resources Division
P. O. Box 7611
U. S. Department of Justice
Washington, DC 10044-7611

Reference: United States and the State of Wisconsin v.
P. H. Glatfelter Company and WTM 1 Company
Civil Action No. 03-C-999 (E.D. Wis.) and
D.J. Ref. 90-11-2-1045/2

TO WHOM IT MAY CONCERN:

At its meeting this week, our Town Board unanimously passed the attached Resolution.

As our Town is directly east of the referenced landfill in the Town of Vinland and down-hill from the proposed PCB landfill, we deem it appropriate to strongly support and become involved in a matter that is vital to not only the residents of the Town of Vinland, but everyone in this entire area.

Despite many of the parties involved having already signed the consent decree, this letter and resolution is being filed with your office to show opposition. It is hoped that the federal judge involved with this case will seriously look at the facts involved in an effort to <u>permanently</u> solve the PCB problem and not surrender to the proposed plans to landfill this sediment. Thank you.

Sincerely,

Jan DeKeyser, Supervisor

Attachment

OU1 COM 018

NOV - 4 2003

# TOWN OF NEENAH – RESOLUTION TO SUPPORT THE
# TOWN OF VINLAND
# TO HALT THE PLAN FOR LANDFILLING OF PCB-LADEN SEDIMENTS

**WHEREAS**, it is currently proposed by the Wisconsin Department of Natural Resources that PCB-laden sediments from Little Lake Butte des Morts are to be deposited in a landfill located in the Town of Vinland, Winnebago County, Wisconsin; and

**WHEREAS**, the plan to disturb and remove these PCBs from the Lake and the Fox River system is controversial, nonetheless the commitment put forth by the State and the EPA is commendable; and

**WHEREAS**, the DNR is considering vitrification (gas furnace technology) as a part of the Record of Decision for the sediment removed from other Operable Units in the Fox River system, they have proposed to landfill the PCB-laden sediments from Operable Unit #1 located in Little Lake Butte des Morts; and

**WHEREAS**, the landfilling of PCBs will allow toxic components to lay in the ground for hundreds of years and will require monitoring for centuries at tremendous continued costs; and

**WHEREAS**, the responsibility on the part of the landfill operator ceases after 40 years following closure and the necessity for clean-up remains forever as a burden to future generations; and

**WHEREAS**, the technology for vitrification exists, the EPA has verified that vitrification destroys 99.9999% of all PCBs forever, while producing a usable glass aggregate byproduct; and

**WHEREAS**, the Town of Vinland Board of Supervisors is currently attempting to convince the Wisconsin Department of Natural Resources that landfilling these PCBs is not in the long-term best interest of humanity,

**NOW THEREFORE BE IT RESOLVED**, that the Town of Neenah Board of Supervisors adopts this resolution in support of a request by the Town of Vinland for vitrification of PCB-laden waste from Operable Unit #1 in Little Lake Butte des Morts as opposed to landfilling.

**BE IT FURTHER RESOLVED**, that the Town of Neenah Board of Supervisors urges our elected representatives at the State and Federal levels to convince the Wisconsin Department of Natural Resources to reconsider their landfill plans.

**BE IT FURTHER RESOLVED**, that a copy of this resolution be sent to the Wisconsin Department of Natural Resources, to our elected legislators, to the Wisconsin Towns Association, to the Office of Governor Doyle, the United States Environmental Protection Agency, and Minergy Corporation.

Dated this 27th day of October, 2003.

TOWN OF NEENAH

Steven J. Spanbauer, Chairman

Attest:

Carita Williams, Clerk

OU1 COM 019

Stone


# PETER J. GLOEDE

3513 County Highway GG
Oshkosh, WI 54904
PHONE (920) 232-6661


October 28, 2003

Dear Assistant Attorney General,

I am a resident of the Town of Vinland in Winnebago County, Wisconsin. I am sending you this letter requesting your help regarding a very serious matter that needs immediate attention. I am referring to United States and the State of Wisconsin v. PH Glatfelter Company and WTM 1 Company, Civil Action No. 03-C-999 (E.D. Wis.) and D.J. Ref. 90-11-2-1045/2. This is the clean up of PCB sediments deposited in the Fox River by seven paper companies between 1957 and 1971.

We applaud the State and EPA efforts in getting agreements for clean up of the Fox River, but we point out that at no time in the entire process has the Town of Vinland been consulted regarding the propriety of depositing the PCB sediments in our Town.

On September 24, our Town officials met with DNR representatives Ed Lynch and Len Polczinski who gave a presentation regarding the clean up. From this presentation we learned that vitrification (glass furnace technology) was considered as part of the Record of Decision (ROD) for Operable Unit 3 and Operable Unit 4, but was excluded from the means of disposal for Operable Unit 1, which is Little Lake Butte des Morts. These sediments from Little Lake Butte des Morts are proposed for deposit in the Georgia-Pacific landfill located in the Town of Vinland under the ROD for Operable Unit 1.

According to the DNR's presentation, the landfill process is projected to take from 3 to 6 years. Vitrification would take 7 years. The landfill of these toxic PCB sediments will remain in a state of toxicity for hundreds of years and will have to be monitored for centuries. The cost for land filling these contaminants is projected to be $66,000,000.

Vitrification, a melting process, would neutralize the toxicity of the PCB's entirely. Also, the lead and mercury contained in the sediment would be rendered harmless. The cost of this process for Operable Unit 1 is estimated to be between $80,000,000 and $100,000,000, and is estimated to take 7 years. This is a very short time period and a very small cost for the responsible parties to undertake for permanent elimination of these carcinogens.

It has been claimed that depositing these PCBs in a landfill is safe, but no prior experiment has ever been undertaken with the proposed process on a long-term scale. The Winnebago County Landfill, which is approximately 3 miles south of the Georgia-Pacific landfill, has accepted PCB sediments from experimental dredging of the Fox River. This landfill is already reporting PCB contamination in the leachate from the experimental dumpsite. In Operable Unit 1 it is estimated that over 16,000 tons of sediment will exceed PCB levels of 50 parts per million, bringing this landfill under the Federal Toxic Substances Control Act.

The DNR was questioned why vitrification was not considered for Operable Unit 1. They responded that at the time of preparing for the Record of Decision for Operable Unit 1, the costs for vitrification were not known, and the parties involved were anxious to get started with the clean up. This seems a highly unsatisfactory basis for a decision that will affect future generations of the Town of Vinland.


NOV - 4 2003


OU1 COM 020

Terry Carroll of Minergy Corporation has advised that a plant sufficient in size to apply gas furnace technology to all the sediments in Little Lake Butte des Morts can be constructed in one year at a site already owned and operated by Minergy. This site is directly adjacent to the site where the proposed dewatering of the sediments is to take place.

We have a company in Minergy that has the technology to render these substances harmless. They also have a suitable site adjacent to the proposed sediment dewatering facility. The by-product of the vitrification process can be used in scores of glass aggregate products, from roadbeds to roof shingles. They can also do this in a cost efficient manner and on a similar time schedule as dumping the sediments in a landfill.

The primary purpose of this letter is to urge you to take official action and commence immediate proceedings to amend the Record of Decision for Operable Unit 1to make vitrification the required remedial treatment method for the PCB sediments of Little Lake Butte des Morts in lieu of land filling these substances.

Sincerely,

Peter J. Gloede

OU1 COM 021

*Family Dental Practice, S.C.*
*Thomas H. Galow, D.D.S.*



OU1 COM 022

*1218 Witzel Avenue*
*Oshkosh, Wisconsin 54901*
*(920) 231-7780*

Your Honor,

I am very concerned about PCB's possible being dumped into our landfill. I am upset that this issue has just been brought do our attention (end of Sept)! I have been to 3 meetings, and as you can see by the enclosed article - all decisions are made! I used to think the DNR & the EPA, looked out for all of us. My eyes have now been opened. I cannot believe that Vitrification is not even a possibility here! Your job here is to make sure this decree is fair, legal and in the public interest - please get all the correct information, before deciding. I have 2 small children - 1 already dealing with Learning disabilities, and I pray daily that my children

will be fine. Who knows - maybe her problems are a result of PCB's, lead or other toxic materials that the DNR say are safe!! Please consider all the options - Let me ask - Would you want to raise your children, or grand children, where in ~~it~~ your backyard - PCB's are being dumped?

The answer is Vitrification!! Only you can help us now!

Thank you for your time!

Sincerely,

Meg

10-11-2/0Y1/2

DEPARTMENT OF JUSTICE

NOV 17 2003

LANDS DIVISION
[illegible]MENT RECORDS

OU1 COM 023

# Sediment likely to be landfilled

*Residents can tell concerns to judge*

BY JEFF BOLLIER
of The Northwestern

Residents concerned about landfilling contaminated sediments from Little Lake Butte des Morts can tell it to the judge, but U.S. Environmental Protection Agency and Department of Justice officials said it won't do much good.

A decree detailing paying and conducting the cleanup of Little Lake Butte des Morts will not require a federal judge to consider whether river sediments contaminated with polychlorinated biphenyls, or PCBs, are landfilled or destroyed through a melting process, officials said.

EPA and DOJ representatives discussed the proposed consent decree for cleaning up Little Lake Butte des Morts during a public meeting at the Neenah Public Library Wednesday night, but those in attendance weren't happy to hear what they had to say.

"The judge's charge under the law is to make sure this decree is fair, legal and in the public interest," EPA Attorney Roger Grimes said. "If your belief is that we should send this to the moon, you can tell the judge that, but that decision has come and gone in this case."

The judge must approve the decree before the cleanup can begin and will consider written comments submitted regarding the decree by Monday, Nov. 17.

The majority of the questions asked involved reconsidering depositing sediments in a landfill in the town of Vinland, but EPA and DOJ officials said disposal options were not a part of the decree.

Grimes said if the decree is approved, the cleanup effort could begin as soon as the 2004 construction season.

*Jeff Bollier: (920) 426-6688 or jbollier@thenorthwestern.com.*


At a glance
■ Written comments on the consent decree may be sent to: Assistant Attorney General, Environment and Natural

OU1 COM 024

8700NE

**DENNIS & JEANNE LUEBKE FARM**
**3497 COUNTY ROAD GG**
**OSHKOSH, WISCONSIN 54904-9750**
**PHONE/FAX: (920) 233-3035**
**E-MAIL: adjfarm@northnet.net**

November 5, 2003

Re: Fox River Clean Up / PCB Sediments
Operable Unit 1

President George Bush
Secretary of Agriculture, Ann M. Veneman
Secretary of Health & Human Services, Tommy G. Thompson
Administrator, Environmental Protection Agency, Christine Todd Whitman
Attorney General, John D. Ashcroft
✓ Assistant Attorney General, Environment and Natural Resources Division
Governor James Doyle
Senator Russ Feingold
Senator Herb Kohl
Senator Carol Roessler
Senator Michael Ellis
Representative Tom Petri
Representative Terry McCormick
Representative Carol Owens
Representative Gregg Underheim
Representative Dean Kaufert
Secretary Scott Hassett, Wisconsin Dept. of Natural Resources
US EPA, Attn: James Hahnenberg
Edward Lynch, Wisconsin Dept. of Natural Resources

GREETINGS! PLEASE READ! PLEASE HELP! THANK YOU!!!!!!!

I am sure most of you have seen the enclosed letter supplied by the Town of Vinland's attorney. He has stated the facts as we know them. We are in complete agreement.

The purpose of this letter is to urge you to take official action and commence immediate proceedings to AMEND the RECORD OF DECISION FOR OPERABLE UNIT 1 TO MAKE VITRIFICATION THE REQUIRED REMEDIAL TREATMENT METHOD for the PCB SEDIMENTS of Little Lake Butte des Morts.

The ONLY way to DESTROY the PCB's is VITRIFICATION.

90-11-2-1045/2

DEPARTMENT OF JUSTICE
NOV 12 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 025

The ONLY treatment of the PCB's is VITRIFICATION.

VITRIFICATION will <u>INSURE</u> not only this GENERATION, but FUTURE GENERATIONS of the danger of PCB's.

The destroying of the PCB's will be the most cost effective approach.

In the process of landfilling the PCB's, the initial cost is there, but the additional cost of monitoring the PCB's, the possible leakage, drainage, and possibility of removing and relocating the PCB's is cost prohibitive.

We understand at this time, the PCB's in the Winnebago County Landfill are leaching out. The City of Oshkosh will no longer take any run off in their sewerage system. Wouldn't it have been better to destroy the PCB's than to try and fix the problem now?????

As we understand the process, a well is dug near the landfill site to monitor the PCB's. <u>IF</u> (when) there is leakage of the PCB's into the water system, this will affect all surrounding areas, near and far. We understand the PCB's store themselves in the fat tissues of fish, animals and humans. <u>IF</u> (when) this contamination happens, not only will our health suffer, but our property will no longer have any value, we will no longer be able to raise ANY livestock, dairy, beef, poultry, fish, wildlife, etc. We will no longer be able to make a living. WHO WILL SUPPORT ALL OF THE PEOPLE THAT WILL BE AFFECTED!!!!!!!!

We are enclosing an article from the Oshkosh Northwestern. Please read it. PLEASE HELP!!!!!!!

VITRIFICATION - THE DESTROYING OF PCB'S IS THE ONLY WAY TO PROCEED - INSURING THE FUTURE OF OUR COUNTRY!!!!!!!!

<u>PLEASE TAKE STEPS TO INSURE WE HAVE A FUTURE!!!!!!!!!</u>

Respectfully,

Jeanne & Dennis Luebke

Jeanne & Dennis Luebke

Enclosure Letter

OU1 COM 026

October 23, 2003

RE: Fox River Clean Up/PCB Sediments

Dear Sir:

I am a resident of the Town of Vinland in Winnebago County. I am sending you this letter requesting your help regarding a very serious matter that needs immediate attention.

We applaud the State and EPA efforts in getting agreements for clean up of the Fox River but we point out that at no time in the entire process has the Town of Vinland ever been consulted regarding the propriety of depositing the PCB sediments in a landfill located in our Town.

On September 24th, our Town officials met with DNR representatives Ed Lynch and Len Polczinski, who gave a presentation regarding the clean up. From this presentation, we learned that vitrification (gas furnace technology) was considered as part of the Record of Decision (ROD) for Operable Unit 3 and Operable Unit 4 but was excluded from the means of disposal for Operable Unit 1, which is Little Lake Butte des Morts. These sediments from Little Lake Butte des Morts are proposed for deposit in the Georgia-Pacific landfill located in the Town of Vinland under the ROD for Operable Unit 1.

According to the DNR's presentation, the landfill process is projected to take from 3 to 6 years. Vitrification would take 7 years. The landfill of these toxin PCB sediments will remain in a state of toxicity for hundreds of years and will have to be monitored literally for centuries. The cost is projected at $66,000,000 for land filling these contaminants.

Vitrification, a melting process, however, would neutralize entirely the toxicity of the PCBs (and also the dioxins, lead and mercury would be rendered harmless) and would take 7 years at a cost of $80,000,000 to $100,000,000 for Operable Unit 1. This is a very short time period and a very small cost for the responsible parties to undertake for permanent elimination of these carcinogens. It has been claimed that deposit of the PCBs is safe but no prior experiment has ever been undertaken with the proposed process on a large long-term scale. Already, the Winnebago County landfill has discovered PCB contamination in the leachate from the experimental dumpsite where PCB sediments have been previously deposited at low concentration. In Operable Unit 1, it is estimated that over 16,000 tons of PCB sediments will exceed 50 parts per 1,000,000, bringing this landfill under the Federal Toxic Substances Control Act.

When the DNR was questioned why vitrification was not considered for Operable Unit 1, the response given was that at the time Operable Unit 1 was prepared the costs of vitrification were unknown and all parties were anxious to get started with the clean up in Operable Unit 1. This seems a highly unsatisfactory basis for decision for a long-term problem that will effect literally scores of future generations in the Town of Vinland and Winnebago County.

Terry Carroll of Minergy Corporation has advised that a plant sufficient in size to apply gas furnace technology to all the sediments in Little Lake Butte des Morts can be constructed in one year at a site already owned and operated by Minergy directly adjacent to where the proposed dewatering of these sediments is to take place. In other words, we have a willing company, a suitable site and a viable plan of implementation based upon a test process of vitrification pertaining to these sediments already conducted in cooperation with Minergy and the DNR showing that the process is completely successful in neutralizing the substance and yielding a re-salable glass product that can be used in highway construction and other applications.

PCBs do not break down in nature and will last over 500 years. No one knows for sure how long. PCBs become soluble in leachate as already proven at the Winnebago County landfill. Financial security for managing the Georgia-Pacific landfill in the Town of Vinland is required by law for only 40 years after closure. Who will bear the cost of monitoring, reconstruction and cleanup of this site for the next 500 years after that?

A letter from Edward K. Lynch of the DNR, dated September 17th, 2003 confirms that Minergy unit cost studies had not been completed for Operable Unit 1 at the time the ROD for Operable Unit 1 was completed and had the information been available, an affirmative answer would probably have been given to the question of implementability as part of the ROD for Operable Unit 1.

**The primary purpose of this letter is to urge you to take official action and commence immediate proceedings to amend the Record of Decision for Operable Unit 1 to make vitrification the required remedial treatment method for the PCB sediments of Little Lake Butte des Morts in lieu of land filling these substances.**

Sincerely,

Jeanne & Dennis Luebke

OU1 COM 028

# Sediment likely to be landfilled

*Residents can tell concerns to judge*

BY JEFF BOLLIER
of The Northwestern

Residents concerned about landfilling contaminated sediments from Little Lake Butte des Morts can tell it to the judge, but U.S. Environmental Protection Agency and Department of Justice officials said it won't do much good.

A decree detailing paying and conducting the cleanup of Little Lake Butte des Morts will not require a federal judge to consider whether river sediments contaminated with polychlorinated biphenyls, or PCBs, are landfilled or destroyed through a melting process, officials said.

EPA and DOJ representatives discussed the proposed consent decree for cleaning up Little Lake Butte des Morts during a public meeting at the Neenah Public Library Wednesday night, but those in attendance weren't happy to hear what they had to say.

"The judge's charge under the law is to make sure this decree is fair, legal and in the public interest," EPA Attorney Roger Grimes said. "If your belief is that we should send this to the moon, you can tell the judge that, but that decision has come and gone in this case."

The judge must approve the decree before the cleanup can begin and will consider written comments submitted regarding the decree by Monday, Nov. 17.

The majority of the questions asked involved reconsidering depositing sediments in a landfill in the town of Vinland, but EPA and DOJ officials said disposal options were not a part of the decree.

Grimes said if the decree is approved, the cleanup effort could begin as soon as the 2004 construction season.

*Jeff Bollier: (920) 426-6688 or jbollier@thenorthwestern.com.*



Oshkosh Northwestern

Thursday, October 30, 2003

OU1 COM 029



***Clean Water Action Council of Northeast Wisconsin, Inc.***

*East Port Center, 1270 Main Street, Suite 120*
*Green Bay, Wisconsin 54302*
***Phone:*** *920-437-7304* ***Fax:*** *920-437-7326* ***E-mail:*** *cwac@execpc.com* ***ebpage:*** *www.FoxRiverWatch.com*

***Board of Directors***

*Thomas Kees*
*President*
*Curt Andersen*
*Vice President*
*Steve Abitz*
*Secretary*
*John Hermanson*
*Treasurer*

*Mary Beth Arnett*
*Kirsten Blankenheim*
*Dale Druckrey*
*Christine Fossen*
*Inez Kinchen*
*Gerald Lemerond*
*Mark Mahoney*
*Dean Reich*
*George Rock*
*Robert Schmitz*
*John Shier*
*Rosalie Shier*
*Thomas Sydow*

***Staff***

*Rebecca Leighton Katers*
*Executive Director*

November 17, 2003

Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Dept. of Justice
Washington, DC 20044-7611

Dear Sir or Madam,

This is the formal comment of Clean Water Action Council regarding the recent consent decree for Little Lake Butte des Morts (LLBDM) in Wisconsin: **United States and the state of Wisconsin v. P.H. Glatfelter Co. and WTMI Co., Civil Action No. 03-C-949 (E.D.Wis.) and D.J. Ref. 90-11-2-1045/2.**

These comments will be brief, because we know they will be ignored. We oppose this consent decree for the following reasons:

**1. Premature** --- The design phase is not yet complete and the physical remediation methods not yet chosen, yet the parties claim to be providing enough to cover the costs. How can they know this with any certainty?

**2. Not Enough Money** --- This agreement does not provide sufficient cushion to cover unexpected problems or potential cost overruns for the upcoming LLBDM cleanup. Some examples:

**a. Unexpected fuel costs** --- These are volatile times for fuel prices and this is an energy intensive project. We don't believe the agreement includes sufficient extra dollars to cover a large spike in diesel and gas prices should they occur. Public taxpayers should not have to cover overages.

**b. Landfill problems** --- These PCBs could remain toxic for more than 1,000 years at the landfill, but this agreement rests all long term maintenance responsibilities on the landfill owner, who in turn relies on a longterm state landfill management fund which could easily run dry as problems crop up across the state. After 30-40 years of paying into the fund, the management is turned over to the government. We don't believe this mechanism is sufficient to ensure that the particular landfill envisioned in this agreement will be properly maintained in perpetuity. In this case, the PRPs should be required to post bonds upfront to ensure longterm maintenance and integrity at the landfill.

**c. Cap problems** --- The Record of Decision left open the possibility that some of the contaminated LLBDM sediments would be capped in place, rather than removed, treated or landfilled. Unfortunately, the extent of capping has not been specified. We are concerned that the longterm costs of cap monitoring and maintenance are shortchanged in this agreement, because these costs will need to be covered for more than 1,000 years, due to the persistant nature of the contaminants. We suspect that cap maintenance work will be required many times over the centuries, because the river is an actively eroding environment.

OU1 COM 030

**3. Inadequate Public Comment Period** --- How can the public evaluate the adequacy of this consent decree when the design phase is still incomplete? Many costly elements are still uncertain. It certainly appears that this agreement is providing only the minimum funds necessary for a minimal cleanup, with costs the driving factor, not the need for public health protection.

**4. Inadequate Cleanup** --- We have already testified numerous times objecting to the fact that the governments are not following their own analysis and evidence. The Remedial Investigation/Feasibility Study stated that the 0.25 ppm PCB cleanup target was "the minimum standard for achieving public health protection goals in a cost-effective manner." Unfortunately, the governments chose a much weaker cleanup target of 1 ppm, which is actually 90 times less stringent than the level needed to fully protect public health. Our health is being sacrificed in order to gain this settlement from the polluters. This consent decree settles for too little money to achieve even the minimal 0.25 ppm PCB dredging cleanup target, guaranteeing public health risks downstream of LLBDM for many unnecessary decades. The technology is easily available to do a better job, but this consent decree does not require it.

**5. Natural Resource Damage (NRD) Settlements Too Low** --- This consent decree includes a very small percentage for Natural Resource Damages. These dollars are far too little to meet the NRD responsibilities of these two polluting corporations, and must not be considered their final allocation. In fact, we've been told by the federal government that they are now using a new allocation formula which is being kept secret. (Again, how can the public provide meaningful input when critical information is being withheld?)

**6. No Public Input on Restoration Expenditures** --- We've been extremely frustrated by the governments complete exclusion of public input from their spending of potentially hundreds of millions of NRD dollars for restoration projects. Virtually everyone who commented during the multi-year public NRDA process raised concerns about how projects would be picked and who would make decisions. We were promised many times that a public process would be developed and public meetings would occur, but so far only one generally publicized public meeting of the Natural Resource Trustee Council has been held, while dozens of projects have already received final approval. That one meeting was held last June and it was a fiasco. We sent a formal letter (see attached) to all the Co-Trustees detailing our concerns from that meeting, but did not receive a single reply. At the June meeting, we were promised that the Co-Trustees would hold quarterly public meetings, but it has been nearly 7 months since the last meeting, and we've been told that no additional meetings have yet to be scheduled. Recently, we received an EPA "Fox River Current" newsletter, which included an article (see attached) describing the new government philosophy regarding project selection. Basically, five Trustees will choose project priorities with ZERO public input. Citizens can propose a project, and perhaps influence the outcome regarding that ONE project, but have no access or input opportunities regarding any other project under consideration. A small clique of insiders will make all decisions in isolation.

We would be less concerned about this if the projects already chosen as a result of the first final settlement with Georgia-Pacific Corporation had been responsive to citizen concerns expressed during the NRDA process, or if the projects had followed the priorities promised in the final Restoration Plan, but instead that first consent decree was an outrage. The governments have not listened to public concerns and have not kept their promises to us.

Given the selection of new restoration projects announced last June, we are also worried that the Wisconsin DNR will attempt to appropriate significant portions of the NRD settlements to make up for cuts in their own department budget. For example, numerous fish hatchery projects were chosen by the Trustee Council this summer, but fish stocking is only a short term fix, not a true longterm ecosystem restoration. This is suspect.

We urge the governments to stop this consent decree until it requires a better-funded and more secure cleanup, and the NRDA project selection process has been opened for public review and input.

Sincerely,

Rebecca Katers

Rebecca Katers, Executive Director

OU1 COM 031

Stone



**Clean Water Action Council of Northeast Wisconsin, Inc.**

*East Port Center, 1270 Main Street, Suite 120*
*Green Bay, Wisconsin 54302*
***Phone:*** *920-437-7304* ***Fax:*** *920-437-7326* ***E-mail:*** *cwac@execpc.com* ***ebpage:*** *www.FoxRiverWatch.com*

***Board of Directors***

*Thomas Kees*
*President*
*Curt Andersen*
*Vice President*
*Steve Abitz*
*Secretary*
*John Hermanson*
*Treasurer*

*Mary Beth Arnett*
*Kirsten Blankenheim*
*Dale Druckrey*
*Christine Fossen*
*Inez Kinchen*
*Gerald Lemerond*
*Mark Mahoney*
*Dean Reich*
*George Rock*
*Robert Schmitz*
*John Shier*
*Rosalie Shier*
*Thomas Sydow*

***Staff***

*Rebecca Leighton Katers*
*Executive Director*

June 5, 2003

Governor James Doyle
19 East, State Capitol
P.O. Box 2043
Madison, WI 53701-2043

Dear Governor Doyle,

We are deeply concerned about the Wisconsin DNR's negative attitude towards public participation, and are hoping that under your new Administration this situation can be improved.

Over the last 10 years, we've seen a disturbing pattern of neglect or manipulation of public input processes related to the Fox River PCB cleanup and compensation plans. (We can provide many examples and documentation, if necessary.) The DNR has avoided providing public comment opportunities on many occasions, despite our many formal and informal requests. DNR-led meetings are often structured or staffed in a manner to discourage public input.

At the same time, the DNR talks about "customer service" and how much they want public involvement. Frankly, many of our members feel manipulated, used and ignored even if we do try to participate in good faith. This discourages involvement (which seems to be DNR's intent.)

## A Recent Example

On June 3, 2003, the Natural Resource Trustee Council met publicly for the first time, hosted by the Oneida Nation at their Radisson Hotel complex in Green Bay. They also held an evening "Open House."

This relatively new Council will control the disbursement of potentially **hundreds of millions of PCB Damage Assessment compensation dollars**, to be spent on restoration and conservation projects in the affected area. By law, public input is supposed to occur as part of this process.

While the DNR is only one of several Co-Trustees on this Council, we've gotten the strong impression that the other Co-Trustees tend to defer to the DNR in order to maintain a working relationship. Because of this, we believe that the DNR's attitude and leadership is key to improving the Trustee Council's public input process.

## Serious Public Process Problems

Prior to the meeting, the Trustees claimed that *"Public attendance is encouraged at both sessions. The Trustees hope that by participating in their meetings, people will have a better understanding of the process, which would encourage better restoration project proposals and produce a restored environment that addresses the public's needs."*

DEPARTMENT OF JUSTICE
MAY 21 2003
LANDS DIVISION
ENFORCEMENT RECORDS

OU1 COM 032

90-11-2-1045/2

Unfortunately, the meeting was mishandled, making public involvement difficult and meaningless. Key problems were as follows:

**1. Public Forum was Too Late** — The Trustee Council scheduled a "Public Forum" for citizen comment opportunities at 3:30 p.m., **after** the Council had conducted all its business and voted from 1:30-3:30 p.m. Because the decisions were already made, public comments were pointless and a waste of time.

**2. Public Misinformed of Actual Meeting Time** — We were told the Trustee Council would meet from 1:30-3:30 p.m., but they actually met for the entire morning and through the lunch hour. A lot of business was conducted privately before the so-called "public" meeting occurred. We had been promised several times previously by Trustee representatives that "the Trustee Council meetings would be completely public," but the Council's excuse now is that the morning and lunch meetings were an "executive session" discussing land purchases which can't be open to the public. We weren't allowed to attend, so we have no idea whether this was truly the case. Our trust in the "Trustees" has grown very thin.

**3. News Media Weren't Properly Informed.** According to one local news reporter, they received a news release about the Tuesday meeting from the Oneida Tribe late Friday, but she didn't see it until the weekend. A second reporter didn't remember seeing any news release. A few days prior, Clean Water Action Council had contacted the Green Bay Press Gazette and Green Bay News Chronicle to give them meeting details, but the resulting articles were printed too late to allow citizens to plan much in advance or inform others. The larger paper's article appeared the actual day of the event. If readers waited to read the article after work, it would have been too late. One TV station carried it on their Tuesday supper-time news giving citizens just one hour to make it to the Open House from 6:30 to 8:30 p.m. This is not proper publicity.

**4. Newsletter was Vague on Details.** A skimpy article appeared one month prior in the government's newsletter, "Fox River Current," vaguely describing the meeting but giving no details. Less than three weeks before the event, when we called the U.S. Fish & Wildlife Service for the exact date, time and place, they referred us to the Oneida Tribe, who couldn't give us details. This meant that our Clean Water Action Council newsletter notice was incomplete. We learned the details a week before the Trustee Council meeting only because we attended a local Remedial Action Plan Science and Technical Advisory Committee meeting where someone asked for details.

**5. Meeting Room Not Marked** — The Radisson Hotel is a big place, yet there were no directories or signs telling the public where the Trustee Council was meeting. The sign outside the closed doors of the meeting room said it was an "Oneida Environmental Meeting." The public should not have to guess that they're in the right place before they open the door.

**6. People Couldn't Hear or See** — The meeting was held in a large, long room, with fans in the ceiling making enough noise that it was difficult to hear. The situation wasn't helped by the fact that several of the Trustee Council bureaucrats mumbled and behaved as if they were having private conversations. The projection screen was a long way from the public seating section, making it difficult to read the fine print of the visual presentation. We were sitting in the front row and still couldn't read it.

**7. Scripted Meeting** — It was obvious that the public portion of the meeting was carefully scripted and sanitized for public consumption. They moved steadily through their agenda items, with little discussion or debate. Several Trustee Council members presented pieces of the program, often reading their item, with every agency playing a part.

**8. Real Business Conducted Elsewhere** — The Council has actually been meeting informally (without public input) for at least 2 years already. The nitty-gritty work of finalizing the Restoration Plan and evaluating project proposals is conducted by a technical work group that reports to the Trustee Council. Clean Water Action Council asked whether these work group meetings would be open to the public, but the Trustees carefully avoided answering the question. One Trustee mentioned that sensitive land negotiations couldn't be opened for public discussion without endangering projects; however, other government committees have han-

dled this type of business by structuring their agendas to lump all the non-sensitive discussions together for an open meeting, and going into closed session only when necessary.

**9. "Forgot" Public Forum** — The Trustee Council scheduled the "Public Forum" from 3:30 to 4:30, with a one hour limit, then proceeded to restrict it to a question and answer period for half an hour. When the questions ended, the Chair tried to adjourn the meeting. This put the Clean Water Action Council representative in the uncomfortable position of objecting and reminding them that citizens were supposed to have an opportunity to comment. It was very awkward. It seemed obvious that comments weren't welcome.

**10. Public Forum Left Out Public** — The "Public Forum" was held in the afternoon at 3:30 p.m., making it impossible for normal working people to attend. The Trustee Council scheduled a ridiculous "Open House" in the evening when they could have provided another true "Public Forum" opportunity, but they didn't. Citizens routinely ask us, "What is an Open House? What does that mean? What's the point of my attending?" We've protested to the Wisconsin DNR about such sessions in the past, because as stand-alone events they just don't work to get the public involved in a meaningful way. As usual, we've been ignored.

**11. Taxpayer Money Squandered.** Because publicity was so poor, only 2 new people attended the "Open House" who hadn't attended the afternoon meeting. This means 15-20 agency staff people, taxpayer funded, were standing around with nothing to do. It's likely that some of the long-distance government officials had to schedule hotel stays, dinner and breakfast because of the useless evening session. They also wasted our time, because we had to leave for 2 hours then come back for the evening meeting.

**12. Deliberate Stonewalling** — For two years, the Clean Water Action Council has asked several representatives of the Trustee Council (from the DNR, U.S. Fish & Wildlife Service, and the Oneida Tribe) for information on how the $40 million from Appleton Paper and NCR Corporation is being spent. We've pestered them repeatedly for details on project proposals, and asked what public input process would be used. (Generally, the agency staff people roll their eyes when we ask ... often they become openly hostile.) We've been assured numerous times that "of course public input opportunities will be provided." Now, **the Trustee Council has given final approval to 17 major projects costing nearly $9 million, with no public input.** We're getting awfully tired of government surprises. Our governments make us pay dearly for wars to establish democracies in countries that don't want it, while we can't seem to achieve a democracy here at home, despite our outspoken efforts.

**13. Selective, Biased Consultation** — When asked, the Wisconsin DNR representatives said they would occasionally consult with "outside experts" regarding proposed projects, but the DNR will control when and where that consultation occurs. Comments will be invited only from people the DNR wants to hear from. It's interesting that they have not been willing to share the project proposals with the Science and Technical Advisory Committee (STAC) for the Fox River and Green Bay Remedial Action Plan. This group has been meeting 17 years on cleanup and restoration issues, but the Trustee Council has shut them out as well. While we sometimes disagree with the STAC, it's amazing that even the STAC has been ignored by the Trustee Council.

**14. Inaccurate Portrayal of Public Comments** — Trustee Council members asked the U.S. Fish & Wildlife Service representative, Collette Charbonneau, to summarize the public comments made concerning the proposed Restoration Plan. She proceeded to claim that the public comments mostly supported the agencies' proposals. End of report. Her claim was highly inaccurate and a slap in the face to everyone who raised serious concerns about several elements of the plan. **Is it any wonder that we feel public input is ignored?**

**15. Vacation Time** — The Trustee Council waited to hold their public meeting during a time when the public was least-likely to attend, during the brief summer vacation months, after all the college campuses have gone on break. This follows a pattern laid down over many years of the Fox River cleanup issue, with important meetings often scheduled in the most inconvenient seasons. (summer break, or Christmas holiday)

OU1 COM 034

## Terrible Future Policy Choice By-Passes the Public

The Trustee Council approved their final "Public Outreach" policy at this meeting. **They voted to not conduct their own public input process regarding project selection** (...ignoring our formal written comments emphasizing how important it was to have meaningful public input.) Instead, **they voted to make applicants for project funding show proof that public input opportunities were provided** regarding their project at some time in the past. It's a flagrantly lazy approach, and badly flawed for several reasons:

- **Too Late and No Time Limit** — The Trustee Council's policy means that the public opportunity process could be already over before an applicant even proposes his or her project. As the Wisconsin DNR representatives pointed out at the meeting, many of the proposed projects have already been through some kind of public input process, so it's already too late for the interested public to have input. This is convenient for the Trustee Council, but a rip-off for the public. There was no time frame stated in the policy, so a project could have been proposed many years ago and that would satisfy the Trustee Council. They specifically cited the Remedial Action Plan (RAP) process, but the last public hearing regarding that corrupt effort was held at least 10 years ago. Some of the project ideas proposed then are outdated now or questionable. Full public discussion never occurred on most of the RAP proposals.

- **Uncoordinated** — With hundreds of applicants vying for approval, the public would find it impossible to keep track of the permit and local approval status of all the proposals throughout Northeast Wisconsin and the Upper Peninsula of Michigan, to ensure that they had input at the proper times. It would be easy to miss many input opportunities.

- **Wasting Time** — Many proposals won't get NRDA funds, so the public would be forced to waste time tracking and participating in public hearings or written comments on hundreds of potential projects which wouldn't make the first cut in the Trustee's process. The very idea is ridiculous.

- **Local vs. Regional** — Many of the proposed projects may have gone through some kind of local public input process at a Town Board, or through a DNR permit process, but the larger regional population served by the Restoration Plan would be completely ignorant of the projects. Would people in Marinette have any inkling of a project proposed in Manitowoc County? Would it occur to them that they should participate in a Manitowoc County public hearing? Would a Marinette newspaper carry news of a local Manitowoc County project? Of course not. A local input opportunity is not the same as a regional input opportunity. (Also, local decision-makers often resent "outsiders" interfering in local issues, so "outsider" input would be discounted in those local processes.) Public awareness, publicity and relevance factors must be adequate.

- **Good Projects, but Bad NRDA Choices** — Local public approval of a local project is not the same as regional public approval of the expenditure of limited NRDA funds for the project. For example, Clean Water Action Council is generally supportive of recreational and park projects in the region. This does not mean we support NRDA funds being used to pay for them. It's a matter of priority. The Trustee Council's public input process should include an opportunity for the public to comment on the relative priority of various projects. Another example could be imbalance of project choices: fisheries projects might be good, but how many fisheries projects? A few recreation projects might be O.K., but not all concentrated in just one county (as in the Georgia-Pacific settlement.) Overall regional fairness can't be evaluated one project at a time.

- **Legality is not Public Input** — The DNR representatives at the Trustee Council meeting claimed that if the project complies with the law, this should be good enough for the public. It's not. Just because a project is approved by the DNR (often over public objections) through a permit or "environmental assessment" process, this is not the same as saying the public approves the project as an NRDA expenditure. In addition, many permit processes involve only one aspect of a project (such as a water quality certification), which means that public comments regarding other aspects of the project are not considered relevant (such as air quality impacts, traffic, endangered species, public use opportunities, alternatives, etc.) An NRDA project should be subject to a comprehensive review by the public, with all aspects considered.

## Conclusion

This meeting was infuriating on many levels, and clearly violated the intent of the laws governing Natural Resource Damage Assessments, which state that Trustees are supposed to be *"accountable to the public for the funds."*

The meeting also violated the Trustee Council's own proposed Restoration Plan which states on page 36 that *"projects will be selected...through a cooperative process between Co-Trustees and partners."* And *"potential cooperators include...non-profit organizations and other appropriate entities."* (Note: Clean Water Action Council is a non-profit organization.) On page 37, the Plan states, *"By law, the trustees are responsible to the public for the damages being disbursed to restore resources injured by the release of hazardous substances."*

This accountability and responsiveness simply isn't happening.

As the years go by, we are continually amazed when agencies deliberately shoot themselves in the feet. They take simple ideas about public participation and twist them beyond recognition, thereby **alienating members of the public who would otherwise be the most supportive and interested in helping their efforts**. The Trustees should be viewing the public as a valuable information resource, but instead they seem to work overtime to exclude public input whenever humanly possible.

It's possible that many of this meeting's problems can be excused as honest mistakes. But if the Trustee Council can't organize such a simple meeting properly, perhaps we shouldn't be surprised that they can't design a decent public participation plan either. After all these years they still don't seem to "get it." Given that several of the people are trained public relations specialists, the mistakes don't seem innocent.

It was obvious from the Council's behavior that the Wisconsin DNR is considered the leader, or more accurately, the problem to be worked around. **The DNR staff are control freaks, defiant and unwilling to bend an inch to allow meaningful public input.** A few of the other Council members seemed to be trying to moderate some of the more outrageous decisions announced by the DNR staff, with no effect. **The DNR is going to do what the DNR wants. As always.**

The Trustee Council won't meet again formally for another 3 or 4 months. In the meantime, the DNR staff said the project approval process at the technical workgroup level will be ongoing, *"like a revolving door."* They're currently considering another 54 projects, which they refused to detail. They're proceeding with no accountability to the public.

Meanwhile, the DNR's public relations staff tell us they really want to involve the public.

This is a serious problem which needs correction as soon as possible.

Sincerely,

Rebecca Katers

Rebecca Katers
Executive Director

cc: Scott Hassett, DNR Secretary
Todd Ambs, DNR Administrator
Frank Horvath, USFWS NRDA Coordinator
Janet Smith, USFWS Green Bay Field Office Supervisor
Christina Danforth, Chair of the Oneida Nation
Pat Pelky, Area Manager, Oneida Tribe Env. Health & Safety Dept.
Joan Delabreau, Chair of the Menominee Nation
Kathleen Cavanaugh, Asst. Attorney General, Michigan

OU1 COM 036

# Trustees to Accept NRDA Proposals

By Greg Swanson, Wisconsin Department of Natural Resources

The criteria and categories for potential restoration activities are outlined in the restoration plan released earlier this year by the trustees for the Lower Fox River/Green Bay Natural Resource Damage Assessment site. According to Greg Hill, NRDA coordinator for the Wisconsin Department of Natural Resources, the trustees will partner with municipalities or area non-governmental organizations wishing to propose projects.

"In beginning these restoration activities, the trustees recognize that by working with the broad network of potential partners who have historically assisted in resource management issues and projects, more resource restoration, rehabilitation or recovery projects may be developed and implemented," Hill explained.

Although the trustees have a history with local organizations such as the Nature Conservancy, Door County Land Trust, and Walleyes for Tomorrow, they will review proposals from almost any grass roots organization. To be a partner, Hill said a group needs a project where it owns, manages, or sponsors something. "If someone owns ecologically significant property and wants to preserve its integrity, a group could act as a liaison," he continued.

Trustees plan to work within their own organizations and with partners to develop projects. The projects must represent priority activities and fit within the goals established in the restoration plan. The trustees will consider funding a project if it proposes to restore or help recover an injured resource or if it contributes to the equal ecological value within the restoration area.

Hill said the plan's goals include protection of wetlands, associated uplands and stream banks, improvement of water quality and fisheries habitat, and the development of human recreation projects.

"Examples of an acceptable priority project would be the restoration of fisheries in a river or watershed or the protection or restoration of water fowl or habitat for birds injured by PCBs," Hill continued.

Here is an example of how the process could work. A project might get its start as an idea from a sportsman's club wanting to increase the recreational fishing opportunities for walleye on a particular stretch of the Lower Fox River. The club is seeking NRDA settlement funds to pay for additional stocking of walleye in this stretch of the river and may have funds to share in the cost of some of the work.

The next step would be for the club to contact the appropriate trustee, in this case the DNR, to discuss

*See* **NRDA Proposals**, *Page 3*

## NRDA Web Page Goes Live

By Susan Pastor, U.S. Environmental Protection Agency

A page detailing the natural resource damage assessment has been added to the Wisconsin Department of Natural Resources Lower Fox River Web site.

Available since September, the page explains what the assessment is about as well as directs readers to trustee council meeting minutes, the joint restoration plan, fact sheets and consent decrees. It also outlines restoration projects and gives an example of how organizations may submit a restoration project proposal. It also lists the agencies and tribes serving as natural resource trustees.

The page can be found at http://www.dnr.state.wi.us/org/water/wm/lowerfox/nrda.html.

Feedback may be directed to Trustee Council Coordinator Colette Charbonneau, U.S. Fish and Wildlife Service, Colette_Charbonneau@fws.gov.

**NRDA Proposals** *from Page 2*

the idea. Working with a DNR fisheries biologist and other staff, the pros and cons of the idea can be examined. It may be that the most limiting factor to improve walleye fishing is not the number of fish stocked, but the lack of suitable habitat, or homes, for the fish. Or, it may be that walleye have been stocked in the past, but there is no self-sustaining reproduction because of a lack of suitable areas for spawning. It may be that there are plenty of fish, but access is limited. The DNR may also have a project idea in which some level of non-government sponsorship is needed to make it happen.

Through discussions and a partnership with the DNR, a project could be developed that addresses the ecological factors and is financially viable and supported by technical staff. The project is then submitted to the trustees for a review of consistency with criteria and goals in the restoration plan. Final acceptance of the project is left to a five-member board, called the trustee council, which is comprised of the authorized officials of the agencies.

The agencies who have trustee representation are the DNR, Michigan Attorney General, Michigan Department of Environmental Quality, U.S. Fish and Wildlife Service, National Oceanic and Atmospheric Administration, Oneida Tribe of Indians of Wisconsin and Menominee Indian Tribe of Wisconsin.

For further information on how to propose a project, contact Hill at (608) 267-9352.

**Cleanup Agreement** *from Page 1*

In addition to the cleanup, the companies will pay $3 million toward their overall liability for natural resource damages, and $1.05 million as partial reimbursement of costs incurred by EPA, DNR and U.S. Department of the Interior.

Although not at the press conference, EPA Regional Administrator Tom Skinner voiced his support. "It's a strong commitment by the mills and it bodes well for additional agreements that address the rest of the contamination," he said.

*Contractors are already taking samples in Little Lake Buttes des Morts as part of the design work.*

Charlie Wooley, U.S. Fish and Wildlife Service Region 3 assistant regional director also expressed his satisfaction with the agreement. "This is another step in working toward resolution of the natural resource damage component with WTM I and P.H. Glatfelter. This will allow the trustees to engage in habitat restoration that will benefit the people of Wisconsin."

Neenah Mayor George Scherk, Menasha Mayor Joe Laux, Town of Menasha Chairman Arden Tews, and representatives from the two paper companies were also at the press conference.

The Little Lake Buttes des Morts cleanup plan calls for dredging 784,000 cubic yards of PCB-contaminated sediment. The sediment will be dewatered, or squeezed. The cleaned water would then be returned to the river. The dewatered sediment will be trucked to a state-approved landfill for permanent disposal.

Detailed engineering work for the cleanup has already begun under another agreement with WTM I announced earlier this summer. Contractors can be seen on the lake as they take sediment samples from boats. Dredging is scheduled to begin in 2004. The selection

OU1 COM 038 — *See* **Cleanup Agreement**, *Page 7*