UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF WISCONSIN, | : <br> : <br> : |
| Plaintiffs, | : <br> : CIVIL ACTION NO. 03-c-0949 |
| v. | : <br> : |
| P. H. GLATFELTER COMPANY and WTM I COMPANY (f/k/a Wisconsin Tissue Mills Inc.), | : <br> : The Honorable Lynn Adelman <br> : <br> : |
| Defendants. | : <br> : |

# MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT P.H. GLATFELTER COMPANY FOR A CASE MANAGEMENT ORDER

This case, filed in 2003, involves claims by the United States and the State of Wisconsin arising from the release of polychlorinated biphenyls ("PCBs") to the Fox River in northeast Wisconsin. In their claim for injunctive relief, plaintiffs seek "to abate the danger or threat presented by releases or threatened releases of hazardous substances into the environment at ***and from*** OU1." Complaint ¶ 20 (emphasis added). OU1 is "the segment of the Lower Fox River designated as Operable Unit 1 ('OU1') of the Site (Little Lake Butte des Morts)." Complaint ¶ 1. Defendant P.H. Glatfelter Co.'s ("Glatfelter") predecessor, the Bergstrom Paper Company ("Bergstrom"), operated a recycling paper mill in Neenah, Wisconsin, at the upstream end of OU1.

Along with the Complaint, the parties lodged a consent decree with this Court committing Glatfelter and defendant WTM I Company ("WTMI") to implement the remedial action -- the cleanup -- selected by plaintiffs for OU1 ("Consent Decree").

The United States has now issued a unilateral administrative order (the "UAO") to Glatfelter, among other parties, directing Glatfelter to implement a remedy in portions of the Lower Fox River downstream of OU1, the vast majority of which are approximately 30 miles downstream of OU1 and are separated from OU1 by 12 intervening dams and 17 intervening locks. A copy of the UAO accompanies this motion as Exhibit A. The UAO asserts that Glatfelter bears responsibility for work downstream in Operable Units 2, 3, 4, and 5 ("OUs 2 through 5") as a result of releases *from* OU1. *See* UAO ¶¶ 7.b.ii., 47. Thus, the United States now takes the position that the Consent Decree resolves the claim for injunctive relief asserted in Count III of the Complaint with regard only to response actions to be taken in OU1, and does *not* resolve the claims for work downstream in OUs 2 through 5.

Glatfelter has defenses to Count III, particularly defenses to claims for liability for areas 30 miles and many dams downstream of OU1. Glatfelter is entitled to the opportunity to present its defenses to this Court. Accordingly, Glatfelter now moves for a case management order to allow orderly litigation of the unsettled portion of plaintiffs' claim for injunctive relief.

Glatfelter wishes to be clear about the relief it is *not* seeking from this Court at this time. Glatfelter is not seeking to appeal or to challenge the UAO. The time for that challenge would come if and when the United States seeks to enforce the UAO by amending its complaint here or otherwise. At this time, Glatfelter only seeks to defend the claim that plaintiffs brought and now assert that the Consent Decree did not settle.

### A. Background on Glatfelter's Operation and Paper Operations of NCR Corporation and WTMI

In 1954, the NCR Corporation ("NCR") began manufacturing NCR®-brand carbonless copy paper ("NCR® paper"). The back of NCR® paper carries a coating of microscopic capsules (at the time formed of gelatin) containing a solvent and then one or more

inks or dyes. When a printer key would strike or a pen would write on the paper, the microcapsules would break and the inks or dyes would make an image on second (or subsequent) sheets without the need for interleaved carbon-paper sheets. The Court will be familiar with credit card receipts and other forms printed on this paper. From 1954 until 1971, NCR used PCBs as the solvent for the inks in the microcapsules coated on its paper. *See* UAO ¶ 7.a.iv.

NCR manufactured the microcapsules in Dayton, Ohio, and along the Fox River in Portage, Wisconsin, upstream of OU1. It then shipped a slurry of the microcapsules to coating plants for placement onto rolls of paper. More than two-thirds of the microcapsule coating applied to NCR® paper from 1954 to 1971 was applied at a coating plant in Appleton, Wisconsin, initially owned by Appleton Coated Paper Company. *See* UAO ¶ 7.a.iv. NCR acquired the Appleton plant when it acquired Appleton Coated Paper Company. *See* UAO ¶ 7.a.v.

During manufacture of the microcapsules in Portage, NCR lost a percentage of the PCBs due to manufacturing and other typical housekeeping issues. NCR would have released the PCB-containing capsules to the sewer, from which they were discharged to the Fox River upstream of OU1. Similarly, some of the microcapsule-containing material would be lost during the coating of those capsules on the paper in Appleton. NCR and its predecessor sent much of that material to the sewer from which it was discharged to the Fox River ***downstream*** of the Appleton Dam, which marks the downstream end of OU1. Much of the material passed through the Appleton Sewage Treatment Plant and received some treatment; other wastewater was discharged to the river without treatment. *See* UAO ¶ 7.a.x.-xi. In either case, a significant volume -- Glatfelter contends, the majority of all of the mass of PCBs ever discharged to the river -- was discharged at Appleton, downstream of OU1.

However, some of the NCR® paper coated in Appleton or Dayton would become production scrap (known as "broke") during the manufacturing process. *See* UAO ¶ 7.a.ix. Other NCR® paper would become production scrap (typically known as "cuttings" or "trim") during conversion of rolls of NCR® paper into business forms. Much of the broke and trim was sold or given to recycling paper mills. In addition, some of the NCR® paper sold for use ultimately would have ended up in wastepaper sold to a recycling paper mill.

Glatfelter's predecessor, Bergstrom, operated a paper mill in Neenah, Wisconsin, at which Bergstrom made fine printing and writing papers ("the Bergstrom mill"). *See* UAO ¶ 7.b.iii. Beginning in 1904, Bergstrom used recycled paper, rather than virgin wood, as its principal source of fiber for making paper. Some of that recycled paper turned out to be NCR® paper, and consequently, Bergstrom's wastewater discharge to the Fox River contained PCBs. *See* UAO ¶ 7.b. That discharge occurred in Neenah at the upstream end of OU1, about six miles upstream of the Appleton Dam.

Glatfelter's co-defendant -- WTMI Corporation -- is the successor to a corporation that operated another recycling paper mill in Menasha, Wisconsin. Neenah is on the southwest side of Little Lake Butte de Morts; Menasha is on the southeast side. The Fox River flows south to north. Plaintiffs allege that WTMI's predecessor recycled NCR® paper and discharged PCBs directly and through the Menasha sewage treatment plant to OU1. *See* UAO ¶ 7.c.ii.; Complaint ¶¶ 6, 13.

PCBs do not dissolve well in water, and instead tend to dissolve in or to adhere to organic materials in the solid particles in the stream. Thus, PCBs tend to be found in sediments on the bottom of Little Lake Butte des Morts (that is, OU1) and in other sediment deposits downstream.

## B. The Consent Decree

In 2002, the United States Environmental Protection Agency ("EPA") and the Wisconsin Department of Natural Resources ("WDNR") selected a remedy for the cleanup of OU1. *See* Consent Decree ¶¶ G-I. They were concerned that contamination in OU1 could otherwise impact downstream portions of the Site. *See* Plaintiffs' Joint Brief in Support of Motion to Enter "Consent Decree For Remedial Design And Remedial Action At Operable Unit 1 Of The Lower Fox River And Green Bay Site" (hereinafter "Plaintiffs' Brief in Support of Consent Decree"), at 12 ("Removing [the OU1 sediment] source of contamination would, to a significant degree: (i) reduce PCB transport from OU 1 to the downstream portions of the [Lower Fox] River and Green Bay; . . . ."). Glatfelter and WTMI stepped forward and have been implementing the remedy at OU1.

Soon after filing the Complaint, plaintiffs moved for entry of the Consent Decree. The Consent Decree, which the Court approved on April 12, 2004, provided that defendants would conduct response activities at OU1, would pay for that work using a specially-dedicated escrow account, and would pay for some natural resource damages and past costs incurred by federal and state agencies. *See* Consent Decree ¶¶ 5-6. By entering the Consent Decree, defendants did not admit to any liability arising from the transactions or occurrences alleged in the Complaint, "nor [did] they acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or the environment." Consent Decree ¶ F. Nevertheless, defendants agreed to the obligations set forth in the Consent Decree to resolve at least some of the claims contained in the Complaint, including the United States' claim for injunctive relief under section 106 of CERCLA to abate a danger or threat presented by releases or threatened releases of hazardous substances "at and from OU1." *See* Complaint ¶ 20. Defendants further agreed,

under certain conditions, not to contest that they each owned or operated a facility from which hazardous substances were disposed and from which there were releases which caused the incurrence of response costs for OU1. *See* Consent Decree ¶ 20.c.(i).

Since that time, Glatfelter and WTMI have worked diligently to complete the cleanup of OU1. The OU1 project is, at this time, the largest environmental dredging project ever attempted in the United States, and perhaps the world.

Nevertheless, the parties recognized in the Consent Decree that this resolution of claims for completion of the OU1 remedy did not necessarily resolve claims that plaintiffs might seek to assert regarding other remedial actions further downstream. *See* Consent Decree ¶ 89.b. Glatfelter contended that such claims were not meritorious, and certainly inappropriate in light of the commitment made in OU1, but all parties recognized that the governments had not released them. Indeed, as is evident from Count III, the claim for injunctive relief to abate releases *from* OU1 has already been asserted in this case.

## C. The Unilateral Administrative Order from EPA and Count III of the Complaint Assert the Same Claim.

On November 14, 2007, Glatfelter received the UAO. EPA issued the UAO under section 106 of the Comprehensive Environmental, Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9606. UAO ¶ 1. The UAO directs Glatfelter and others, jointly and severally, to take certain remedial actions with respect to areas of the river downstream of OU1, in OUs 2 through 5. *See* UAO ¶¶ 2, 44-48.

Count III of the Complaint seeks injunctive relief pursuant to section 106 of CERCLA to address releases of hazardous substances "from OU1." Plaintiffs do not contend, nor does the UAO allege, that Glatfelter or its predecessor has any connection to any dumping or releasing of hazardous substances other than as the result of operations of the Bergstrom mill in

OU1. Rather, the UAO predicates Glatfelter's responsibility on releases that are "from OU1." Accordingly, the UAO seeks relief for the same releases under the same statutory section as does Count III of the Complaint.

Section 106(a) of CERCLA empowers the Attorney General to secure relief necessary to abate an "imminent and substantial endangerment" to public health, welfare, or the environment from a release or threatened release of hazardous substances. 42 U.S.C. § 9606(a). Further, "the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require." *Id.* Section 106(a) also empowers the President to issue orders necessary to protect public health, welfare, and the environment. *Id.* Thus, the United States may pursue different options to compel a party liable under section 106(a) to take action.

In this case, the United States has invoked both. The UAO reflects the United States' view that the parties have not settled all of Count III of the Complaint in this action. Glatfelter does not by this motion seek to determine whether the United States is at liberty to issue a UAO under the second sentence of section 106(a) having *already* invoked the equitable jurisdiction of this Court under the first sentence of section 106(a).[1] Glatfelter merely observes

---

[1] The United States' actions raise two issues. First, EPA has selected a remedy for OUs 2 through 5 administratively. The United States has also invoked this Court's equitable jurisdiction to order a remedy. Courts are generally not bound by EPA's administrative remedy selection in actions under the first sentence of section 106(a), and, indeed, are not obligated to afford that remedy selection deferential review. *See, e.g., United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 435-36 (1st Cir. 1990); *United States v. Conservation Chem. Co.*, 661 F. Supp. 1416, 1428-29 (W.D. Mo. 1987). Second, an issue exists as to whether an administrative order issued by an agency of the United States after the United States has filed suit under the first sentence of section 106(a) is enforceable in any context. At this time, all Glatfelter seeks is a case management order allowing the governments' claim (and Glatfelter's defenses to that claim) under the first sentence of section 106(a) to be litigated. These issues are for a later juncture.

that if the United States is issuing orders to obtain relief for which the United States has already sued in this Court, then that pending claim in this Court must not be settled. Accordingly, Glatfelter should have an opportunity to defend the claim.

Accordingly, by this motion, Glatfelter seeks a case management order under which the parties can litigate plaintiffs' claim under section 106 of CERCLA to enjoin Glatfelter to clean up PCBs in OUs 2 through 5 allegedly present as a result of releases "from" OU1. Of course, Glatfelter intends to prove in this Court that it is *not* responsible for any work required in OUs 2 through 5, and that judgment will bind the parties.

Plaintiffs will likely argue that they did not intend the Complaint to assert any claim for injunctive relief requiring work downstream of OU1. However, if plaintiffs *did* seek that relief, they would not have to amend Count III. The clear language of the pleading seeks an injunction to abate a release "from OU1." Thus, it seeks relief for releases over or around the Appleton Dam downstream. That claim is the very claim asserted in the UAO. Indeed, the Complaint's allegations, while much shorter, are not different from the findings that EPA purports to make in the UAO to support a direction to Glatfelter to clean up downstream. *Compare* Complaint ¶ 20 *with* UAO ¶¶ 1, 7b., 15, 31-36.

### D. A Case Management Order in the Attached Form is Appropriate.

The Consent Decree had the effect of staying the pleadings in this case after filing of the Complaint. Now that the United States has made clear that it seeks further relief on the claim asserted in Count III, Glatfelter (and WTMI if it so chooses) should be afforded an opportunity to answer and to assert any appropriate affirmative defenses. Glatfelter has attached its proposed answer as Exhibit B. The proposed case management order would grant leave for the answer to be filed.

This is a complex Superfund matter. Efforts to prepare and to try complex Superfund matters as single cases have often led to unwieldy lawsuits. *See, e.g., Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 651 (6th Cir. 2000) (noting that the district court bifurcated trial in a CERCLA contribution action into liability and allocation of damages phases); *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 411 n.4 (6th Cir. 1999) (referencing the district court's case management order that authorized discovery related to the defendant's liability under CERCLA but stayed discovery regarding allocation of liability under CERCLA pending resolution of motions for summary judgment); *Sauk County v. Grede Foundries, Inc.*, 145 F.R.D. 88, 91 (E.D. Wis. 1992) ("With the plethora of parties and attorneys, the logistics alone of conducting discovery and holding a trial [in this CERCLA action] are extremely cumbersome."). *See also* Moore's Federal Practice: Manual for Complex Litigation (Fourth) § 34.34 (2004) ("CERCLA cases rarely go to trial, but when they do the trial is likely to be complicated."). The three typical phases of CERCLA litigation -- liability, determination of remedy and recoverable costs, and equitable allocation of response costs -- each implicate case-management issues and often lead to management of CERCLA cases in three parts. *See, e.g., In the Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 893 (5th Cir. 1993) (discussing the district court's case management order dividing EPA's CERCLA cost-recovery case into three phases); *In re Chateaugay Corp.*, 193 B.R. 669, 672 (S.D.N.Y. 1996) (discussing initial three-phase division in, and subsequent amendment to, magistrate judge's case management order for EPA's CERCLA action). *See also* Moore's Federal Practice: Manual for Complex Litigation (Fourth) § 34.12 (2004).

Rule 42(b) of the Federal Rules of Civil Procedure authorizes a court to try separately any claim, cross-claim, counterclaim, third-party claim, or any issue "in furtherance of

convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." A decision to separate claims or issues is proper when separate trials (i) would avoid prejudice to a party or promote judicial economy, (ii) would not unfairly prejudice the non-moving party, and (iii) would not violate the Seventh Amendment. *Houseman v. United States Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999). Glatfelter satisfies this standard. This is not a jury trial and does not implicate the Seventh Amendment. And, as explained below, Glatfelter's proposed case management order will promote judicial economy by resolving the critical issue of dispute between the parties, and the United States will not be prejudiced.

This case involves certain cross-cutting issues whose resolution will greatly simplify the remaining issues and increase the likelihood that the parties will settle any remaining dispute. Among the first of these is whether a reasonable basis for apportionment exists between discharges into OU1 and discharges below OU1. In simple terms, the question is whether this is one site with all responsible parties jointly and severally responsible for all costs, or multiple sites with responsible parties only responsible to clean up "their" parts of the river.

Under CERCLA, parties are not jointly and severally liable if a reasonable basis exists to apportion liability. *See In the Matter of Bell Petroleum Servs., Inc.*, 3 F.3d at 902-03; *United States v. Schmalz*, 823 F. Supp. 644, 647 (E.D. Wis. 1993) (citing *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir. 1989)); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992); *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 811 (S.D. Ohio 1983). *See also Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 304 (7th Cir. 1999) ("Doubtless liability for distinct or divisible harms should be kept separate when possible . . . ." (citing Restatement (Second) of Torts §§ 433A, 881)). In this case, for example, the United States does not contend that parties responsible only for discharges below the DePere Dam (the

dam furthest downstream, located at the upstream end of Operable Unit 4) bear any liability for cleanup of areas upstream of the Appleton Dam (the first and most upstream dam at the downstream end of OU1), some 30 miles upstream.

Apparently, the United States has made a similar determination with respect to parties that have documented discharges of PCBs to the furthest upstream locations on the Fox River. It is undisputed that NCR directly or indirectly discharged PCBs into the Fox River at Portage, about 90 miles upstream of OU1. Nonetheless, plaintiffs did not name NCR as a defendant in the Complaint. To the contrary, EPA considers Lake Winnebago, which is immediately upstream from OU1, to be a "background location" relative to OU1 and the downstream reaches of the Fox River. UAO ¶ 25. Thus, even though the governments may wish to treat this as a single "site" for purposes of CERCLA, they have conceded already that a reasonable basis exists for apportionment of some liability, including factors such as distance from the alleged harm.

A similar reasonable basis exists for apportioning the liability for work in OUs 2 through 5 to those responsible for discharges downstream of the Appleton Dam. In summary, all of the discharges containing PCBs in OU1 occurred at the upstream end of Little Lake Butte des Morts, several miles upstream (south) of the Appleton Dam. The downstream end of OU1, closer to the dam, contains sediment. That sediment contains PCBs to a depth of several feet, indicating some influence from discharges during the period when PCBs were in NCR® paper. However, for at least the last half-mile of that sediment deposit, the concentration of PCBs falls below the concentration that requires any cleanup. That muck, if picked up and transported to OUs 2 through 5, would not have to be addressed. And none of it was picked up. If any particles moved, they were carried by the flow of the river, they were mixed with cleaner

materials during the 30-mile trip to the downstream end of the Fox River, and they were even more dilute when they arrived.

Accordingly, Glatfelter will prove at trial that the concentration of PCBs on sediment particles escaping OU1 did not contribute to the need to clean up any downstream deposit. Any PCBs on those sediment particles were so dilute as to form a part of the ordinary background. No releases "from OU1" caused the concentrated deposits of PCBs plaintiffs allege require cleanup downstream of OU1. Those deposits were caused by higher concentration sources below the Appleton Dam and closer to the downstream problems. That is, Glatfelter intends to prove that if there had been no discharges downstream of Appleton Dam, no cleanup in OUs 2 through 5 would be necessary. Further, if there were no discharges in OU1 and only discharges downstream, the logic of the Record of Decision Amendment for OUs 2 through 5 would call for the same remedy as the remedy for which it now calls. *See* UAO ¶¶ 5.a-c, 21.

A factual dispute seems to exist on this point. Otherwise, EPA would not have issued the UAO. Resolution of that factual dispute has the potential greatly to simplify this case, thereby promoting judicial economy. If Glatfelter demonstrates the existence of a reasonable basis for apportionment, then for litigation purposes the Fox River is two sites: (i) OU1 and (ii) the downstream reaches. Different parties bear joint and several liability for each of the two sites, and the smaller sets of parties associated with each site make for more manageable litigation. Even if plaintiffs prevail, which they should not, the resolution of factual issues will simplify litigation or settlement. *See United States v. Alcan Aluminum Corp.*, 964 F.2d at 270 n.29 (contending that it was appropriate to resolve whether the harm was divisible before continuing to the contribution stage of a CERCLA action because the issue involves relative degrees of liability, and delaying resolution could prolong uncertainty and therefore cause the

defendant to be "strong-armed" into settling or risk an illogical and unfair allocation of liability); *In the Matter of Bell Petroleum Servs., Inc.*, 3 F.3d at 901 ("With respect to the timing of the 'divisibility' inquiry, we believe that an early resolution is preferable.").

For this reason, Glatfelter respectfully suggests that the case management order limit the first phase of discovery and trial of this case to (a) plaintiffs' proof of defendants' liability for injunctive relief arising from releases "from OU1" and (b) defendants' affirmative defense of divisibility. Doing so will not prejudice the United States. Its case will not be hamstrung in any regard. Resolution of the issues will resolve the critical dispute remaining after the Consent Decree for liability for contamination downstream of OU1.

By so limiting the case in the first phase, Glatfelter respectfully suggests that the Court may defer litigation of issues having to do with the allocation of liability among jointly and severally liable parties. *See* 42 U.S.C. § 9613(f)(1). Therefore, defendants should be instructed to defer assertion of counterclaims, cross-claims, and third-party claims, and no additional parties should be added to the case until this first phase is completed. For example, EPA issued the UAO to Glatfelter, WTMI, Menasha Corporation, NCR, Appleton Papers Inc., CBC Coating, Inc., Georgia-Pacific Consumer Products, LP, and U.S. Paper Mills Corp. A dispute may exist among those parties as to how much of the costs to be incurred in OU1 or in the downstream operable units each of the jointly and severally liable parties should pay. By deferring that dispute until after the Court has determined whether the OU1 dischargers have any liability for the downstream reach, the Court will simplify the initial phase of this litigation and hopefully will promote settlement. *See* Fed. R. Civ. P. 16 (providing the court with wide latitude to structure the litigation process to expedite disposition of complex cases and to encourage settlement); *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999)

("Conducting an evidentiary hearing limited to a discrete, potentially dispositive issue is an authorized and frequently a sensible method for expediting the decision of cases.").

For the foregoing reasons, Defendant P.H. Glatfelter Company respectfully requests that its motion for a case management order be granted and that an order in the form attached to the motion be entered.

Respectfully submitted,

*s/ David G. Mandelbaum*
David G. Mandelbaum
Harry Weiss*
Marc E. Davies*
Ronald M. Varnum*
Jennifer E. Simon*

Attorneys for Defendant P.H. Glatfelter Company

Dated: November 20, 2007

Of Counsel:

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
(215) 864-8102 (Mr. Mandelbaum direct)
(215) 864-9761 (facsimile)
mandelbaum@ballardspahr.com
weiss@ballardspahr.com
davies@ballardspahr.com
varnumr@ballardspahr.com
simonj@ballardspahr.com

*Applications for admission are pending for Messrs. Weiss, Davies and Varnum and Ms. Simon. Each is admitted to practice before the courts of the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania.

# CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of November, 2007, a true and correct copy of the foregoing Memorandum in Support of Motion of Defendant P.H. Glatfelter Company for a Case Management Order, with accompanying exhibits, was filed electronically via the Electronic Court Filing system and is available for viewing and downloading. In addition, a true and correct copy was served via first-class mail, postage prepaid, upon the following:

Matthew V. Richmond, Esquire
United States Department of Justice (ED-WI)
Office of the US Attorney
517 E. Wisconsin Avenue
Room 530
Milwaukee, WI 53202

Randall M. Stone, Esquire
United States Department of Justice (DC)
Environment & Natural Resources Division
P. O. Box 7611
Washington, DC 20044

Jerry L. Hancock, Esquire
Wisconsin Department of Justice
Office of the Attorney General
17 W. Main Street
P. O. Box 7857
Madison, WI 53707-7857

William H. Harbeck, Esquire
Quarles & Brady, LLP
411 E. Wisconsin Avenue
Suite 2040
Milwaukee, WI 53202-4497

Daniel C. Beckhard, Esquire
United States Department of Justice (DC)
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Jeffrey A. Spector, Esquire
United States Department of Justice (DC)
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Thomas L. Sansonetti, Esquire
United States Department of Justice (DC)
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

*s/ David G. Mandelbaum*
David G. Mandelbaum
Harry Weiss
Marc E. Davies
Ronald M. Varnum
Jennifer E. Simon
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
A Pennsylvania Limited Liability Partnership
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Tel. 215-665-8500

Attorneys for Defendant,
P.H. Glatfelter Company