**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

UNITED STATES OF AMERICA
and the STATE OF WISCONSIN,

         Plaintiffs,

    v.

P. H. GLATFELTER COMPANY
and WTM I COMPANY
(f/k/a Wisconsin Tissue Mills Inc.),

        Defendants.

CIVIL ACTION NO. 2:03-cv-00949-LA

The Honorable Lynn Adelman

**JOINT BRIEF OF PLAINTIFFS UNITED STATES AND**
**STATE OF WISCONSIN IN OPPOSITION TO DEFENDANT**
**P.H. GLATFELTER COMPANY'S MOTION FOR A CASE MANAGEMENT ORDER**

**INTRODUCTION**

This case, which is concluded and closed for purposes of litigation, involved claims by

Plaintiffs against Defendants P.H. Glatfelter Company ("Glatfelter") and WTM I Company

("WTM I") under the Comprehensive Environmental Response, Compensation, and Liability

Act ("CERCLA"), 42 U.S.C. §§ 9601-75, concerning the cleanup of sediments containing

polychlorinated biphenyls ("PCBs") in the uppermost segment of the Lower Fox River and

Green Bay Superfund Site ("Site"), between Lake Winnebago and the Appleton Dam, which is

known as Operable Unit 1 (or "OU1"). The Plaintiffs' Third Claim for Relief sought an order

requiring Defendants to perform a long-term, permanent cleanup of hazardous substances —

a type of cleanup known under CERCLA as a "remedial action" — in OU1. However, any

litigation of the merits of that claim and all other claims in this case was concluded on April 12,

2004, upon this Court's approval and entry of a Consent Decree as a final judgment. The 2004 Consent Decree contained a number of express reservations of rights by the Plaintiffs, including reservations to bring a new lawsuit or take administrative actions to require sediment remediation work in other, downstream segments of the Site, which are known as Operable Units 2, 3, 4, and 5 ("OUs 2-5").[1]

Subsequently, in June 2007, following an extensive administrative process, Plaintiffs completed their selection of a final remedial action concerning OUs 2-5. To facilitate the performance of that remedial action, the United States Environmental Protection Agency ("EPA") — acting pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), and consistent with the 2004 Consent Decree's reservation of rights provisions — issued a Unilateral Administrative Order ("UAO" or "Order") to Glatfelter, WTM I, and several other potentially responsible parties, directing them to carry out that final remedial action for OUs 2-5.

Through its Motion for a Case Management Order in this case, Glatfelter now seeks to challenge EPA's recent administrative activities concerning OUs 2-5. Specifically, Glatfelter's Motion seeks to reopen this long-concluded case (apparently without regard of the final judgment), re-characterize and greatly expand the scope of injunctive relief that Plaintiffs requested in the case, and obtain permission to litigate various "defenses" to that newly-expanded and resuscitated claim. Glatfelter seeks to litigate whether Glatfelter has "any liability for the downstream reach" of the Site. Mem. In Supp. of Mot. of Def. P.H. Glatfelter Co. for a Case Mgmt. Order ("Def.'s Br." or "Br.") at 13. Glatfelter also seeks to litigate whether "the remedy selected by the Plaintiffs . . . for work downstream of OU1 [is] arbitrary and capricious

---

[1] A map showing the five different geographically-defined operable units at the Site is attached hereto as Attachment A.

and not in accordance with law." Def.'s Proposed Answer (Ex. B to Def.'s Br.) at 6. Glatfelter's

ultimate goal through such litigation is to obtain a favorable judgment that "will bind the

parties," Def.'s Br. at 8, and can be used to attack EPA's administrative order (at least as it

applies to Glatfelter) and overturn the chosen remedial action for OUs 2-5. The other Defendant

in this case, WTM I, has not joined Glatfelter's Motion.

The Court should reject Glatfelter's Motion for several reasons. First, Plaintiffs never

sought (and do not now seek) relief against Glatfelter in this case for the performance of the

OU 2-5 remedial action. Even assuming that all of the claims in this case had not been

concluded by entry of a final judgment, Glatfelter cannot broadened Plaintiffs' claims for OU1 in

order to litigate issues that Plaintiffs' claims did not even address, such as whether Glatfelter is

liable for the performance of the remedial action in OUs 2-5, or whether the OU 2-5 remedial

action is inconsistent with CERCLA.

Second, the entry of the Consent Decree as a final judgment means that there are no

longer any claims left to litigate in this case. Thus, regardless of the scope of relief that had been

sought by the Plaintiffs in the Complaint before final judgment, the extent to which the Consent

Decree reserved Plaintiffs' rights to assert claims or bring administrative actions in other cases

or proceedings, or the nature of administrative relief that EPA now seeks against Glatfelter,

this case is clearly no longer a case in which to litigate any sort of claim (or defense). In short,

consistent with the entry of the Consent Decree as a final judgment, this case is and should

remain closed to further litigation over the merits of any claims in the Complaint.

Third, Section 113(h) of CERCLA, 42 U.S.C. § 9613(h), broadly prohibits (with five

exceptions not applicable here) any exercise of jurisdiction over "any challenges" to any

remedial action that is not yet complete, and "any challenges" to "any order" issued by EPA

pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), until after the remedial action required under such order is complete. Because Glatfelter's Motion seeks litigation challenging EPA's Section 106(a) administrative cleanup order and the underlying (and uncompleted) remedial action for OUs 2-5, the Motion is squarely subject to, and barred by, Section 113(h) of CERCLA.

Finally, if the Court finds that it has jurisdiction to entertain Glatfelter's Motion, and the Court is inclined to reopen this case, it certainly should not approve and enter the self-serving case management order proffered by Glatfelter. Plaintiffs should at least be afforded an opportunity to assert additional claims against the two named Defendants, including, for example, broader claims for injunctive relief under CERCLA, claims for recovery of millions of dollars in unreimbursed costs incurred by the government parties, and additional claims for natural resource damages that were discussed in this Court's opinion in <u>United States v. Fort James Operating Co.</u>, 313 F. Supp. 2d 902 (E.D. Wis. 2004). In any such broadened litigation, the Plaintiffs should also be afforded an opportunity to assert corresponding claims against other defendants.[2]

## **ARGUMENT**

**I.      The Court Should Deny Glatfelter's Motion Because The Complaint Did Not Assert Any Claim For Performance Of Cleanup Work In Operable Units 2 Through 5 At The Site.**

Glatfelter is right about one thing: "Plaintiffs will likely argue that they did not intend the Complaint to assert any claim for injunctive relief requiring work downstream of OU1."

---

[2]      As indicated in the letter that is reproduced at Attachment B, some of those other potentially responsible parties have informed the Plaintiffs that they may seek to intervene if this case is reopened, in order to oppose Glatfelter's defenses and assert their own CERCLA claims against Glatfelter (among others).

Def.'s Br. at 8.  As demonstrated below, nothing other than Glatfelter's tortured reading of the

Plaintiffs' Complaint supports the company's linchpin argument – i.e., that in this case Plaintiffs

somehow pled "claims under section 106 of CERCLA to enjoin Glatfelter to clean up PCBs in

OUs 2 through 5."  Def.'s Br. at 8.

Contrary to Glatfelter's suggestion (Br. at 8), the Complaint in this case did not seek to

"enjoin Glatfelter to clean up PCBs in OUs 2 through 5."  Rather, the Complaint stated:

> [T]he United States and the State seek to recover unreimbursed
> response costs associated with response activities relating to the
> segment of the Lower Fox River designated as Operable Unit 1
> ('OU1') of the Site (Little Lake Butte des Morts) . . . .  The United
> States also seeks injunctive relief requiring that the Defendants
> take action to abate conditions at OU1 that may present an
> imminent and substantial endangerment to the public health or
> welfare or the environment because of actual and threatened
> releases of hazardous substances into the environment at and from
> OU1.

Compl. at 2 (emphasis added) (Dkt. No. 1).  The Plaintiffs' plea for injunctive relief was

likewise limited to OU1:

> WHEREFORE, Plaintiffs, the United States of America and the
> State of Wisconsin, respectfully request that this Court . . . Order
> the above-named Defendants to abate the conditions at OU1 that
> may present an imminent and substantial endangerment to the
> public health or welfare or the environment.

Compl. at 6-7 (emphasis added).[3]  This Court's Decision and Order approving the Consent

Decree also recognized that the Plaintiffs' the Complaint sought relief relating to OU1 alone:

> Plaintiffs, the United States and the State of Wisconsin, bring this
> action under the Comprehensive Environmental Response,

_____

[3]     Other courts have focused on the language used in the complaint's plea for relief in
assessing the scope of the claims in a CERCLA case brought by the United States.  See United
States v. Penn Cent. Corp., Nos. CIV.A. 86-1094, 92-6119, 99-4835, 2004 WL 35780, at *5
(E.D. Pa. Jan. 8, 2004).

> Compensation, and Liability Act ('CERCLA'), 42 U.S.C. §§ 9601-
> 9675, alleging that defendants, P.H. Glatfelter Company and
> WTM I Company, are among the parties responsible for PCB
> contamination at Operable Unit 1 ('OU 1'), one of five units in a
> larger site . . . .

Decision & Order at 1-2 (Dkt. No. 22).

Glatfelter tries to make much of the fact that the Complaint references the need "'to abate . . . releases of hazardous substances into the environment at and from OU1.'" Def.'s Br. at 1 (quoting Compl. ¶ 20; emphasis added by Glatfelter; ellipsis inserted). But a simple explanation of that language shows how seriously it has been misconstrued by Glatfelter. As this Court has noted, the Consent Decree in this case requires the Defendants to "implement the cleanup remedy for OU1 that was selected in a December 2002 Record of Decision issued jointly by the U.S. Environmental Protection Agency ('EPA') and the Wisconsin Department of Natural Resources ('WDNR')." Decision & Order at 1-2 (Dkt. No. 22). That Record of Decision, which was formally incorporated into the Consent Decree, identified two main reasons why sediment in OU1 needs to be remediated.[4] First, PCB-contaminated sediment that remains in place in OU1 poses a danger because that sediment releases PCBs into the environment at OU1. Second, PCBs in OU1 sediment are entering the water and migrating downstream, out of OU1, thus causing releases of PCBs into the environment from OU1. As explained in the Record of Decision for OU1:

> The primary objective of this response action is to address the risks
> to human health and the environment due to PCBs in the in-place
> sediments . . . . Removal of the PCB-contaminated sediments will
> result in reduced PCB concentrations in fish tissue, thereby

---

[4] The Record of Decision was attached to the Consent Decree as Decree Appendix H. For the Court's convenience, cited portions of the Record of Decision are attached hereto at Attachment C.

accelerating the reduction in future human health and ecological risks. In addition, by addressing the sediments, the remediation will control a source of PCBs to the water column, which contributes to fish tissue concentrations and transports PCBs into downstream reaches of the River, Green Bay, and eventually to Lake Michigan.

Record of Decision at 11.[5]  Even Glatfelter acknowledges that the Record of Decision for OU1 reflects concerns by EPA and WDNR "that contamination in OU1 could otherwise impact downstream portions of the Site." Def.'s Br. at 5.

Consistent with the plea for relief in the Complaint, the Consent Decree constitutes an "Order [that the] Defendants abate the conditions at OU1 that may present an imminent and substantial endangerment to the public health or welfare or the environment." Compl. at 7 (emphasis added).  As envisioned by the Record of Decision, the Decree thereby addresses the main problems associated with ongoing releases of PCBs at and from OU1.

In conclusion, therefore, the Complaint's reference to releases of hazardous substances "from OU1" was not — and cannot reasonably be construed as — a broad plea for injunctive relief to require performance of a large amount of additional cleanup work in downstream areas of the Site, at OUs 2-5.  Plaintiffs, as the "masters" of their Complaint, were entitled to and did seek injunctive relief only for cleanup work in OU1.  See Garbie v. DaimlerChrysler Corp., 211 F.3d 407, 410 (7th Cir. 2000) ("plaintiffs as masters of the complaint may include (or omit)

_____

[5]  See also id. at 63 ("Reduced PCB loading from OU 1 will ultimately contribute to downstream reduction of concentrations of PCBs in sediment, water and fish, and thereby reduce risk to humans and ecological receptors in the Fox River.") (emphasis added); id. at 15-16 ("less than 1 kilogram/year enters Little Lake Butte des Morts from Lake Winnebago and 40 kilograms (88 pounds)/year are resuspended and transported from Little Lake Butte des Morts to OU 2 (Little Rapids Reach)") (emphasis added).

claims or parties" as they see fit).[6]  The fact that the OU1 cleanup was expected to have

incidental benefits downstream, in OUs 2-5 of the Site, does not change this conclusion.

Accordingly, even if Plaintiffs' injunctive relief claim could still be litigated today, it would

offer no basis on which to litigate the issues that concern Glatfelter today — i.e., whether

Glatfelter is liable for the performance of cleanup work in OUs 2-5, and whether Plaintiffs'

chosen remedy for OUs 2-5 is arbitrary and capricious, or inconsistent with CERCLA.

## II.     The Court Should Deny Glatfelter's Motion Because, Upon Entry Of The Consent Decree As A Final Judgment, No Claims Were Left To Litigate In This Case.

Upon its entry as a final judgment, the Consent Decree left no claims in the Complaint

for Glatfelter to litigate in this action.  The Decree states that it "shall constitute a final judgment

between and among the United States, the State, and the Settling Defendants," and the Court

entered the Decree "as a final judgment under Fed. R. Civ. P. 54 and 58."  Consent Decree ¶ 125

(Dkt. No. 4).  As a final judgment, the Consent Decree "end[ed] the litigation on the merits and

[left] nothing for the court to do but execute the judgment."  Catlin v. United States, 324 U.S.

229, 233 (1945); see Munson Transp., Inc. v. Hajjar, 148 F.3d 711, 714 (7th Cir. 1998) (a final

judgment "ends the litigation" and "leaves nothing to be decided in the district court"); Trustees

of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension

Fund v. Cent. Transp., Inc., 935 F.2d 114, 117 (7th Cir. 1991) (citing Catlin) (a final judgment,

by its nature, is one of "wrapping up the case").[7]

---

        [6]    Even Glatfelter seems to admit (Br. at 8) that the Plaintiffs could simply "amend
Count III" to resolve any confusion regarding the scope of that claim.  Given the entry of final
judgment, however, and unless this Court re-opens this case, such an amendment is completely
unnecessary.

        [7]    Of course, "[w]hen an equity case ends in a permanent injunction, the trial court, with or
                                                                                    (continued...)

Moreover, the record in this case indicates that all of the parties, including Glatfelter, intended and expected that the approval and entry of the Consent Decree as a final judgment would put an end to the litigation of the claims in this case. For example, at the parties' request, the Court entered an order specifying that the Defendants "shall not be required to answer the Complaint if the Court approves and enters the Consent Decree after the public comment period" because that settlement "would resolve the claims in the Complaint, upon the terms and conditions set forth in the Consent Decree." Order Extending Time for Defs. to Answer Compl. at 1-2 (emphasis added) (Dkt. No. 5). Likewise, the motion seeking the Court's approval and entry of the Consent Decree indicated that "the Consent Decree would conclude this case." Pls.' Joint Mot. to Enter Consent Decree at 1 (emphasis added) (Dkt. No. 12).[8] Thus, the relief that Glatfelter's Motion seeks today — i.e., litigation of claims asserted in this case — is not only contrary to the legal meaning and effect of entry of the Decree as a final judgment, but in

_____

[7](...continued)
without an explicit reservation of jurisdiction, retains jurisdiction to enforce the injunction, as by contempt proceedings." McCall-Bey v. Franzen, 777 F.2d 1178, 1183 (7th Cir. 1985); see Shapo v. Engle, 463 F.3d 641, 643 (7th Cir. 2006). Here, the Court expressly retained jurisdiction to construe or modify the Decree, to enforce compliance with its terms, and to resolve disputes arising under its dispute resolution provisions. See Consent Decree ¶ 114 ("Retention of Jurisdiction"). Pursuant to that and other more specific Decree provisions, see id. ¶¶ 89.d, 114, the parties filed two Agreed Supplements to the Consent Decree earlier this year, to document agreements to provide additional funding to effectuate cleanup work in OU1 under the Decree. See Dkt. Nos. 25, 26. In no way do those filings conflict with the entry of the Decree as a final judgment, or indicate that this case remains "active" or open for purposes of litigating any of the claims set forth in the Complaint.

[8]     Because the Motion to Enter the Consent Decree also addressed several agreed corrections to the Decree, Plaintiffs' counsel afforded the Defendants an opportunity to review that Motion before it was filed, and changes to the Motion were made at Defendants' request. Defendants sought no change to the indication that "the Consent Decree would conclude this case."

Case 2:03-cv-00949-LA     Filed 12/14/07     Page 9 of 37     Document 29

sharp conflict with Glatfelter's prior position in this case concerning the effect of the entry of the Decree as a final judgment.

Glatfelter asserts (Br. at 2) that EPA's recently-issued administrative order for the performance of the OU 2-5 remedial action indicates that "the United States now takes the position that the Consent Decree . . . does <u>not</u> resolve the claims for work downstream in OUs 2 through 5." That assertion is accurate, as far as it goes. The United States has always understood that the 2004 Consent Decree expressly <u>reserved</u>, and did <u>not</u> resolve, all of its "rights against Settling Defendants with respect to . . . liability for operable units at the Site other than OU1." Consent Decree ¶ 89.b.[9] In fact, EPA's recent issuance of the UAO for remedial work in OUs 2-5 is fully consistent with that reservation of rights in the 2004 Consent Decree.

However, the United States has never taken the view espoused today by Glatfelter, that — notwithstanding the entry of the 2004 Consent Decree as a final judgment in this case — the United States' reservation of rights, or EPA's recent exercise of its administrative authorities in a manner expressly allowed under those reservations, authorizes the renewed litigation of the claims in this case.[10] Simply put, the fact that the United States expressly reserved certain rights

---

[9]    Indeed, in its order approving the Decree, this Court observed that "[t]he settlement would not resolve defendants' potential liability for response activities or response costs relating to areas of the site other than OU1." Decision & Order at 2 (Dkt. No. 22).

[10]    Glatfelter's argument conflates three distinct concepts: (1) that of a <u>final judgment</u>, which ends the litigation of all claims in the case in which the final judgment was entered; (2) that of a <u>reservation of rights</u>, through which parties to a settlement reserve their rights to assert claims or bring administrative actions — with respect to claims that are not settled or resolved — in other actions or proceedings; and (3) that of a <u>covenant not to sue, release, or waiver of claims</u>, through which parties to a settlement are typically said to "resolve" or "settle" certain claims against each other, in the sense of agreeing not to bring specific claims or administrative actions in other cases or proceedings.

of action in the Decree (and later exercised some of those rights administratively) offers no basis

for Glatfelter's conclusion that there are still claims left to litigate in this case.[11]

In conclusion, therefore, the entry of the Consent Decree as a final judgment put an end

to the litigation of all of the claims (as well as any defenses) in this case. Neither the Plaintiffs'

express reservation of rights in the Decree nor the EPA's recent administrative actions alters that

conclusion. Thus, the Court should deny Glatfelter's efforts to revive the claims and resume

litigation in this concluded case.

III.    **Glatfelter's Motion Should Be Denied Because It Seeks To Mount Impermissible
        Challenges To EPA's Administrative Cleanup Order And The Remedial Action
        Selected For Operable Units 2 Through 5 At The Site.**

Glatfelter's Motion seeks litigation challenging both the merits of the remedial

action selected by EPA and WDNR for OUs 2-5 at the Site, as well as Glatfelter's liability for

the performance of that remedial action as required under EPA's Unilateral Administrative

Order. As such, Glatfelter's Motion is squarely barred by Section 113(h) of CERCLA,

42 U.S.C. § 9613(h), a provision that broadly prohibits (with five exceptions not applicable here)

---

[11]    Glatfelter also maintains (Br. at 7), that there is a question "whether the United States is
at liberty to issue a UAO under the second sentence of [CERCLA] section 106(a) having already
invoked the equitable jurisdiction of this Court under the first sentence of section 106(a)."
(Emphasis in original). To the contrary, no such question exists. In Paragraph 105 of the
Consent Decree, the parties expressly agreed — and through its approval this Court ordered —
that: (1) the Plaintiffs would be able to pursue any reserved claims separately, "[i]n any
subsequent administrative or judicial proceeding initiated by the United States or the State,"
(emphasis added), and (2) Defendants would not be able to raise "any defense or claim based
upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting,
or other defenses based upon any contention that the claims raised by the United States or the
State in the subsequent proceeding were or should have been brought in the instant case." In
fact, even as to OU1, the Decree recognizes "Plaintiffs' right to issue an administrative order or
to institute a judicial proceeding . . . seeking continuation or completion of the Response Work"
if the Decree is terminated due to Defendants' refusal to provide additional funding for
completion of the OU1 work under the Consent Decree. Consent Decree ¶ 99 (emphasis added).

the exercise of federal court jurisdiction over "any challenges" to any remedial action that is not yet complete, and "any challenges" to "any order" issued under CERCLA Section 106(a), 42 U.S.C. § 9606(a), until after the completion of the remedial action required under such order. Therefore, the Court should deny Glatfelter's Motion as beyond the Court's jurisdiction.

A.    **Statutory Framework**

CERCLA provides the President (acting primarily through the EPA) with "broad power" to effectuate the cleanup of hazardous waste sites.  Key Tronic Corp. v. United States, 511 U.S. 809, 814 (1994).  Under Section 104 of CERCLA, 42 U.S.C. § 9604, EPA may select a remedial action at a hazardous waste site (or, as at the Fox River Site, distinct remedial actions for distinct portions of a single waste site).  See 42 U.S.C. § 9601(24) (defining "remedial action").  Acting under CERCLA Section 106(a), EPA may then compel, by means of a unilateral administrative order or a request for judicial relief, responsible parties to undertake remedial actions that have been selected by EPA.  See 42 U.S.C. § 9606(a).[12]

A recipient of a Section 106(a) administrative order has two primary options if it does not believe it is responsible for the performance of the specified remedial action.  See generally Employers Ins. of Wausau v. Browner, 52 F.3d 656, 661-62 (7th Cir. 1995); Raytheon Aircraft Co. v. United States, 435 F. Supp. 2d 1136, 1152-53 (D. Kan. 2006).  First, the recipient can decline to comply with the order and wait for EPA to file an action to enforce the order.  In such an action, EPA can seek civil penalties and punitive damages against the non-complying recipient.  42 U.S.C. §§ 9606(b), 9607(c)(3).  The non-complying party may avoid such penalties

_____

[12]    Alternatively, as demonstrated by the Consent Decree in this case, Section 122 of CERCLA, 42 U.S.C. § 9622, authorizes EPA to enter into judicially-approved settlements that require potentially responsible parties to perform remedial actions.

and damages if it demonstrates that it had "sufficient cause" not to comply with the administrative order. 42 U.S.C. §§ 9606(b), 9607(c)(3).

Second, the order recipient can comply with the order, and — following full implementation of the required remedial action — petition EPA for reimbursement of costs incurred under the order, plus interest. 42 U.S.C. § 9606(b)(2)(A). If EPA refuses to pay, the party that incurred costs can sue EPA to recover the costs. 42 U.S.C. § 9606(b)(2)(A) & (B).

**B.     Section 113(h) Of CERCLA Broadly Prohibits Pre-Enforcement Review Of Ongoing Remedial Actions And Section 106(a) Administrative Orders.**

Section 113(h) of CERCLA effectuates a "'blunt withdrawal of federal jurisdiction,'" over a wide range of potential challenges to remedial actions selected by EPA, as well as administrative cleanup orders issued by EPA. Pollack v. United States Dep't of Defense, __ F.3d __, No. 07-1104, 2007 WL 3023987, at *2 (7th Cir. Oct. 18, 2007) (quoting North Shore Gas Co. v. EPA, 930 F.2d 1239, 1244 (7th Cir. 1991)). Section 113(h) provides, in relevant part, that "[n]o Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section [104 of CERCLA, 42 U.S.C. § 9604], or to review any order issued under section [106(a) of CERCLA, 42 U.S.C. § 9606(a)]," except in five specifically enumerated circumstances. 42 U.S.C. § 9613(h) (emphasis added).[13] "The obvious meaning of this statute is that when a remedy has been selected, no challenge may occur prior to

_____

[13]    "The five exceptions to the jurisdictional bar are all actions filed by the government or by a private citizen seeking to enforce or recover costs for the enforcement of CERCLA[.]" Reardon v. United States, 947 F.2d 1509, 1512 (1st Cir. 1991) (en banc); see 42 U.S.C. § 9613(h)(1)-(5). For this reason, courts commonly state that Section 113(h) bars "pre-enforcement review." E.g., Reardon, 947 F.2d at 1512. As explained below, none of the five exceptions applies here.

completion of the remedy." <u>Schalk v. Reilly</u>, 900 F.2d 1091, 1095 (7th Cir. 1990) (emphasis added); <u>see</u> <u>Frey v. EPA</u>, 270 F.3d 1129, 1133 (7th Cir. 2001).

In enacting Section 113(h), "Congress put decontamination ahead of litigation." <u>In re CMC Heartland Partners</u>, 966 F.2d 1143, 1148 (7th Cir. 1992); <u>Schalk</u>, 900 F.2d at 1095, 1097 (same). As the Seventh Circuit recently explained:

> The policy behind the provision, while perhaps counterintuitive,
> was a considered choice made by Congress. Namely, since toxic
> waste dumps are a major hazard, they should be cleaned up as
> quickly as possible and without interruption by . . . [law]suits,
> which cannot be filed until all cleanup is complete.

<u>Pollack</u>, 2007 WL 3023987, at *2. <u>See also</u> <u>Alabama v. EPA</u>, 871 F.2d 1548, 1557 (11th Cir. 1989) (same; reciting Section 113(h)'s legislative history). Consistent with this legislative purpose, courts have broadly interpreted the term "challenge" in Section 113(h) to encompass "virtually any challenge to ongoing activities at Superfund sites[,]" <u>Heart of Am. NW v. Westinghouse Hanford Co.</u>, 820 F. Supp. 1265, 1276 (E.D. Wash. 1993), including challenges to remedial actions when asserted as <u>defenses</u> in any action other than those actions specifically enumerated in CERCLA Section 113(h)(1)-(5). <u>See</u> <u>United States v. City & County of Denver</u>, 100 F.3d 1509, 1513-14 (10th Cir. 1996).

### C. Glatfelter's Motion Seeks To Allow Challenges To The Unilateral Administrative Order And The Remedial Action For Operable Units 2 Through 5 Of The Site.

Glatfelter's Motion is barred by Section 113(h) because the Motion seeks to commence pre-enforcement litigation on the question whether Glatfelter is liable for the performance of the remedial action for OUs 2-5, as directed by the UAO. Glatfelter's Proposed Answer contains a "First Separate Defense" indicating that Glatfelter will try to prove that it is not liable for

-14-

releases of hazardous substances that are the subject of the OU 2-5 remedial action. See Def.'s Br., Ex. B, at 5-6; see also Def.'s Br. at 2 ("Glatfelter has . . . defenses to claims for liability for areas 30 miles and many dams downstream of OU1. . . . [and] is entitled to an opportunity to present its defenses to this Court."). Because the UAO expressly declares that Glatfelter is jointly and severally liable to perform the remedial action at OUs 2-5, and directs Glatfelter to perform such action, Glatfelter's attempt to litigate the question whether it is liable for the performance of the OU 2-5 remedial action constitutes a prohibited "challenge" to the UAO. See 42 U.S.C. § 9613(h) (prohibiting jurisdiction over "any challenges . . . to review any order issued under section [106(a) of CERCLA]") (emphasis added). Indeed, the case law is clear that Section 113(h) prohibits recipients of Section 106(a) administrative orders from obtaining — prior to the recipient's full implementation of the remedial actions required under the order — judicial review of the recipient's liability to perform the required remedial actions. See CMC Heartland Partners, 966 F.2d at 1148; Wausau, 52 F.3d at 661 (the recipient of the Section 106(a) administrative order "could not challenge the order in advance of having to comply; that route is . . . closed.").[14] As the Seventh Circuit has explained, Section 113(h) is clear that the question "[w]hether EPA is correct" in requiring a party to perform a remedial action under a Section 106(a) administrative order "is subject for another forum, another day." CMC Heartland Partners, 966 F.2d at 1148. Under Section 113(h) and CERCLA's unilateral administrative order

---

[14]     See also Reardon, 947 F.2d at 1513 ("[Section 113(h)] is intended to bar challenges to liability, such as [plaintiffs] seek to make by attacking [EPA's administrative] lien filing, as well as challenges to the remedy EPA has chosen.") (emphasis added); Voluntary Purchasing Groups, Inc. v. Reilly, 889 F.2d 1380, 1388-90 (5th Cir. 1989) (Section 113(h) prohibits pre-enforcement review of an EPA administrative notice indicating a party's liability for site cleanup costs).

Case 2:03-cv-00949-LA     Filed 12/14/07     Page 15 of 37     Document 29

regime, "[f]irms needlessly told to clean up may recover their costs from the EPA afterward. In the meantime they must get the lead out." Id.

While Glatfelter acknowledges (Br. at 2) that "the time for [any challenge to the UAO] would come if and when the United States seeks to enforce the UAO," and thereby implies that its Motion does not run afoul of Section 113(h), the Motion is nothing less than an attempt to duck the jurisdictional bar in order to challenge the chosen cleanup remedy for OUs 2-5 and the UAO. Indeed, elsewhere in its brief, Glatfelter candidly reveals its goal:

> [B]y this motion, Glatfelter seeks a case management order under which the parties can litigate plaintiffs' claim under section 106 of CERCLA to enjoin Glatfelter to clean up PCBs in OUs 2 through 5 allegedly present as a result of releases "from" OU1. Of course, Glatfelter intends to prove in this Court that it is not responsible for any work required in OUs 2 through 5, and that judgment will bind the parties.

Def.'s Br. at 8 (emphasis in original). By thus seeking a judgment of non-liability in this case for the performance of the OU 2-5 remedial action that "will bind the parties" elsewhere, Glatfelter is seeking to obtain a "sword" with which to attack the UAO, at least as it applies to Glatfelter. After all, Glatfelter's Motion comes hot on the heels of EPA's issuance of the UAO, and it is difficult to imagine any other reason — beyond trying to skirt Section 113(h)'s jurisdictional bar — why a settling defendant such as Glatfelter would seek to resuscitate and dramatically expand the scope of a CERCLA Section 106(a) claim for injunctive relief against itself, particularly a claim that (as Glatfelter reads it) seeks to compel the performance of a large and costly remedial action in OUs 2-5. Accordingly, Glatfelter must await "another forum" and

"another day" to assert any challenges to the UAO or the selected remedial action at OUs 2-5. CMC Heartland Partners, 966 F.2d at 1148.[15]

Additionally, Glatfelter's Motion is barred by Section 113(h) because the relief sought amounts to a direct challenge to the chosen remedy for OUs 2-5. For example, the "Second Separate Defense" of Glatfelter's Proposed Answer alleges that "the remedy selected by the Plaintiffs" in the Records of Decision for OUs 2-5 is "arbitrary and capricious and not in accordance with law and specifically inconsistent with the National Contingency Plan." See Def.'s Br., Ex. B, at 6. In other words, Glatfelter seeks litigation in this case in order to invalidate EPA's chosen remedy. That sort of direct, frontal assault on a selected remedy is barred by Section 113(h) until after the remedy is fully implemented. See 42 U.S.C. § 9613(h) (prohibiting jurisdiction "to review any challenges to removal or remedial action selected under section [104 of CERCLA]"); Broward Gardens Tenants Ass'n v. EPA, 311 F.3d 1066, 1072 (11th Cir. 2002) ("a suit interferes with, and thus challenges, a cleanup, . . . if the relief requested will impact the remedial action selected"); e.g., Pollack, 2007 WL 3023987, at *4 (a suit was a prohibited challenge because its "effect . . . would be to halt the ongoing remediation efforts"); Fairchild Semiconductor Corp. v. EPA, 769 F. Supp. 1553, 1559 (N.D. Cal. 1991) (a request for a judicial order "directing EPA to withdraw" a portion of its chosen soil and groundwater

_____

[15]     As explained above, see pp. 12-13, supra, there are two options available to a UAO recipient if it does not believe it is responsible for the performance of the specified remedial action:  (1) comply with the UAO and then seek reimbursement of incurred costs from EPA, or (2) ignore the UAO, wait for EPA to bring a lawsuit to enforce the UAO, and attempt to prove in that action that there was "sufficient cause" for non-compliance.  Notably, a suit against EPA to recover unreimbursed costs, if filed after completion of the remedial action, is excepted from Section 113(h)'s bar.  See 42 U.S.C. § 9613(h)(3).  Similarly, a UAO recipient's attempt to demonstrate sufficient cause for non-compliance with a UAO — if raised in defense to a judicial action to enforce the UAO — is excepted from Section 113(h)'s jurisdictional bar.  See 42 U.S.C. § 9613(h)(2).

-17-

remedy was a "challenge" to the remedy under Section 113(h)), aff'd, 984 F.2d 283 (9th Cir. 1993).[16]

### D. Glatfelter's Motion Does Not Fall Within The Limited Exception Set Forth In CERCLA Section 113(h)(5).

The only arguable exception to Section 113(h)'s jurisdictional bar in this case is set forth in Section 113(h)(5), which permits jurisdiction over challenges to ongoing remedial actions in "[a]n action under section [106(a) of CERCLA] in which the United States has moved to compel a remedial action." 42 U.S.C. § 9613(h)(5).

That limited exception does not apply to Glatfelter's Motion, or the litigation contemplated by the Motion, for at least two reasons. First, as explained above in Argument Section II of this brief, the express entry of final judgment in the 2004 Consent Decree means that any litigation of claims and defenses in this action is over and closed. Thus, assuming arguendo that this action at one time did in fact constitute "[a]n action under section [106(a)]" within the meaning of Section 113(h)(5), it no longer does.

---

[16] Furthermore, even if it was less clear that Glatfelter was seeking to invalidate EPA's chosen remedy for OUs 2-5, that would not save the Motion from Section 113(h)'s jurisdictional bar. The Seventh Circuit has held that "'judicial review itself'" — i.e., the need for EPA to engage in pre-enforcement litigation, regardless of whether the relief sought in that litigation would necessarily affect EPA's selected cleanup plan — "'slows the [cleanup] process down'" so as to "challenge" the cleanup plan within the meaning of Section 113(h). Pollack, 2007 WL 3023987, at *4 (quoting Schalk, 900 F.2d at 1097). In addition, other courts have held that pre-enforcement litigation seeking declarations of non-liability for the payment of response costs or the performance of response actions at Superfund sites, even when such litigation would not actually delay the implementation of the any chosen site remedy, is prohibited by Section 113(h). See Voluntary Purchasing Groups, 889 F.2d at 1390 ("Although review in the case at hand would not delay actual cleanup of hazardous wastes, it would force the EPA — against the wishes of Congress — to engage in 'piecemeal' litigation and use its resources to protect its rights"); Reardon, 947 F.2d at 1513 (quoting Voluntary Purchasing Groups). Thus, significant practical considerations, which Congress had in mind when it enacted Section 113(h), bar the litigation sought by Glatfelter.

-18-

Second, as explained above, this action never did, and does not now, seek the performance of the OU 2-5 remedial action. Even if the Third Claim for Relief in the Complaint in this case were still alive, that claim sought to compel Glatfelter to undertake only the OU1 remedial action, and did not seek injunctive relief in OUs 2-5. Thus, there has never been a nexus between the Third Claim for Relief in the Complaint and the issues Glatfelter seeks to litigate today, concerning the lawfulness of the OU 2-5 remedial action and Glatfelter's liability for the performance of that remedial action under the UAO. The lack of such a nexus renders the exception under Section 113(h)(5) inapplicable. See Raytheon Aircraft, 435 F. Supp. 2d at 1155 (plaintiff's claim under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for the recovery of costs at Superfund site was "unrelated" to EPA's Section 106(a) administrative order issued to plaintiff at the site, and thus, plaintiff's challenge to the EPA order did not fall within Section 113(h)(1)'s exception); United States v. Charles George Trucking Co., Inc., 682 F. Supp. 1260, 1272-73 (D. Mass. 1988) (United States' Section 107(a) claim for recovery of its costs at Superfund site did not bear required nexus to United States' site access motion brought under CERCLA Section 104(e)(5), and thus, defendant's challenge to access motion did not fall within Section 113(h)(1)'s exception). In short, that Glatfelter has been sued under Section 106(a) of CERCLA for the performance of one selected remedial action (in OU1) does not lift the pre-enforcement review bar and give Glatfelter a broad license to challenge another separate and ongoing remedial action (in OUs 2-5) or the administrative order compelling the performance of such action. To hold otherwise would permit the exception under Section 113(h)(5) to expand and swallow Section 113(h)'s jurisdictional bar. See Raytheon, 435 F. Supp. 2d at 1155.

Should the United States later bring a separate civil action against Glatfelter for the performance of the OU 2-5 remedial action, that may trigger the exception under Section 113(h)(5). But the United States quite plainly has not brought such a claim in this or any other case. Accordingly, the Section 113(h)(5) exception does not apply.[17]

## IV. If The Court Reopens Plaintiffs' Claims, The Court Should Decline To Enter The Case Management Order Proposed By Glatfelter.

The Court should not reopen the Plaintiffs' claims, but if the Court does so, it certainly should not enter the self-serving Case Management Order proposed by Glatfelter. That proposed Case Management Order is custom-tailored to allow Glatfelter to challenge its duty to comply with the UAO and to defer all other disputes "until after the Court has determined whether the OU1 dischargers have any liability for the downstream reach." Def.'s Br. at 13. Thus, among other things:

- It would prevent Plaintiffs from adding other CERCLA claims at the Site against Glatfelter until later in the case, including broader claims for injunctive relief,

---

[17]    Section 113(h)(1) of CERCLA also allows certain types of challenges to remedial actions in "[a]n action under section [107 of CERCLA, 42 U.S.C. § 9607] to recover response costs or damages or for contribution." 42 U.S.C. § 9613(h)(1). See United States v. NL Indus., Inc., 936 F. Supp. 545, 551-52 (S.D. Ill. 1996) ("§ 113(h)(1) gives federal courts jurisdiction to review the propriety of the EPA's remedial action once a § 107 action is filed" but "§ 113(h)(1) does not provide federal courts with jurisdiction to enjoin an ongoing remedial action"). Because the First Claim for Relief of the Complaint in this case was brought pursuant to Section 107 of CERCLA, see Compl. ¶ 15, Glatfelter may argue in its reply brief that the First Claim for Relief is still "alive" for litigation purposes, and thus enables Glatfelter to challenge — under Section 113(h)(1)'s exception — EPA's administrative cleanup actions pertaining to OUs 2-5. Such an argument should be rejected, however, for the reasons that the Section 113(h)(5) exception does not apply. First, even if the First Claim for Relief was at one time an "action" within the meaning of the Section 113(h)(1) exception, it is no longer so, in light of the entry of final judgment in this case. Second, the First Claim for Relief in the Complaint sought the recovery of costs incurred and to be incurred in connection with the performance of certain response actions related only to OU1. See Compl. ¶ 15. As such, the claim bears no nexus to response actions in OUs 2-5, and thus would not lift Section 113(h)'s bar for purposes of allowing challenges to EPA's cleanup actions pertaining to OUs 2-5.

claims for recovery of millions of dollars in unreimbursed costs incurred by the government parties, and multi-million dollar claims for natural resource damages.[18]

• It would prevent Plaintiffs from adding other responsible parties as defendants until much later in the case.

• It would limit other responsible parties' participation in the case to protect their interests. Those other parties have an interest in asserting CERCLA contribution claims against Glatfelter. In addition, some of those other parties certainly have factual information and arguments that have bearing on the defenses that Glatfelter wants to litigate.[19]

• It would limit the initial phase of discovery to the defensive issues favored by Glatfelter, and delay all other discovery.

A case management order in a governmental enforcement action under CERCLA should further the fundamental purposes of the statute: ensuring "prompt and efficient cleanup of hazardous waste sites" and "expeditious recovery of money to the [EPA's Hazardous Substance Superfund]." United States v. Kramer, 770 F. Supp. 954, 957, 958 (D.N.J. 1991).[20] But the Case Management Order proposed by Glatfelter would have none of those salutary effects. That proposed order would prejudice the Plaintiffs by limiting when and how they can pursue other

_____

[18] Even if Glatfelter prevailed on its theory that it has no liability beyond OU1, that would not dispose of all the CERCLA claims that the Plaintiffs could assert against the company. For example, the Plaintiffs would still have CERCLA cost recovery claims against Glatfelter for unreimbursed past costs associated with OU1 and for unreimbursed Site-wide costs that cannot be attributed to any one Operable Unit. Once again, the parties to the Consent Decree expressly agreed that the Plaintiffs were reserving such claims. See Consent Decree ¶ 89.b (Dkt. No. 4).

[19] As mentioned above, some of those parties have indicated that they will consider intervening in the case to protect their interests if the case is reopened. See Attachment B to this Brief.

[20] This Court has likewise recognized that "[t]he purposes of CERCLA include expeditious remediation at waste sites, adequate compensation to the public fisc and the imposition of accountability." Fort James, 313 F. Supp. 2d at 911 (citation and internal quotations omitted).

CERCLA claims relating to the Site, and it would encourage wasteful, drawn-out, seriatim litigation of Glatfelter's asserted defenses.

If the Court decides to reopen this case, the Court should set the case for a Preliminary Pretrial Conference under Fed. R. Civ. P. 16 and Civil L.R. 16.1 to "require the parties to appear to consider the future conduct of the case." Civil L.R. 16.1(a). Then, "[a]t or following the conference, the Court may enter any orders which appear necessary to aid in further scheduling the action, including dates for further conferences, briefing, schedules for motions, and cutoff dates for completing discovery." Civil L.R. 16.1(b).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant P.H. Glatfelter Company's Motion to reopen this concluded case. If the Court does reopen the case, the Court should set the matter for a Preliminary Pretrial Conference without entering the Case Management Order proposed by Glatfelter.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division

Dated: December 14, 2007                    s/ *Randall M. Stone*
                                            RANDALL M. STONE
                                            Environmental Enforcement Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 7611
                                            Washington, DC   20044-7611
                                            Randall.Stone@usdoj.gov
                                            (202) 514-1308


                                            s/ *Stephen E. Crowley*
                                            STEPHEN E. CROWLEY
                                            Environmental Defense Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 23986
                                            Washington, DC   20026-3986
                                            Stephen.Crowley@usdoj.gov
                                            (202) 514-0165


                                            STEVEN M. BISKUPIC
                                            United States Attorney

                                            MATTHEW V. RICHMOND
                                            Assistant United States Attorney
                                            Eastern District of Wisconsin
                                            U.S. Courthouse and Federal Building - Room 530
                                            517 E. Wisconsin Avenue
                                            Milwaukee, WI   53202

                                            *Attorneys for the United States*

s/ *Jerry L. Hancock* _____

JERRY L. HANCOCK
THOMAS J. DAWSON
Assistant Attorneys General
Wisconsin Department of Justice
17 West Main Street
Madison, WI   53702
(608) 266-1221

***Attorneys for the State of Wisconsin***



**Attachment B:**     December 12, 2007 Letter



John N. Hanson
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005-3311
Direct: (202) 789-6015
Fax: (202) 789-6190
jhanson@bdlaw.com

December 12, 2007

**PRIVILEGED AND CONFIDENTIAL**

Randall M. Stone, Esq.
U.S. Department of Justice
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington DC 20044-7611

Jerry L. Hancock, Esq.
Wisconsin Department of Justice
123 West Washington Avenue
P.O. Box 7857
Madison, WI 53702

Re:   United States of America and the State of Wisconsin v. P.H. Glatfelter Company
and WTM I Company, CA No. 03-c-0949, U.S.D.C., E.D. Wisconsin: P.H.
Glatfelter Motion for a Case Management Order

Dear Messrs. Stone and Hancock:

P.H. Glatfelter Company (Glatfelter) recently asked the Court in the referenced action to
enter a Case Management Order (CMO) that would allow Glatfelter to litigate at this time the
question of its liability for environmental conditions in areas of the Fox River downstream of
what is known as Operable Unit 1. The proposed CMO would, among other things, bar the
parties to that action from asserting additional claims or adding any additional parties without
leave of Court.

As Counsel for the Companies listed below, we write to ask that the Plaintiffs oppose
Glatfelter's request. The referenced action concerns only Operable Unit 1; it does not concern
the parts of the Fox River downstream from Operable Unit 1. Glatfelter should not be allowed to
turn that case into litigation over its environmental responsibilities beyond Operable Unit 1.

The Environmental Protection Agency has alleged in its November 13, 2007 Unilateral
Administrative Order (UAO) that Glatfelter and our clients, and others, are responsible for
certain environmental conditions in parts of the Fox River downstream from Operable Unit 1.
Glatfelter points to that UAO as the reason to expand the nature the referenced case so that it can
resolve its liability in those downstream areas. Yet Glatfelter does not propose to join our
clients; and it would bar the Plaintiffs from doing so. This is improper for a variety of reasons.
In particular, our clients' rights and interests are directly affected by Glatfelter's request. The
request goes to the heart of the allocation issues for the whole Fox River, not just Operable Unit

# BEVERIDGE & DIAMOND PC

1, and the evidence Glatfelter alludes to in its motion is relevant to these issues. Under no circumstances could the Court adequately evaluate Glatfelter's claims without the benefit of evidence that could be submitted by parties, such as our clients, with legal interests in these claims. It may be in Glatfelter's narrow self-interest to try to have the Court adjudicate these issues on a limited and undeveloped record, but it is not consistent with the interests of justice to do so. If the Plaintiffs do not oppose that request, or if that request is granted, our clients, and others with potential liability will need to have the opportunity to be heard on these issues, through motions to intervene, third party complaints or otherwise, to litigate our clients' alleged liability in the Fox River downstream of Operable Unit 1 and Glatfelter's as well, including Glatfelter's liability to our clients for environmental conditions in those downstream parts of the River.

If you would like to discuss this matter with us, please let us know.

Very truly yours,

John N. Hanson
On behalf of Georgia-Pacific Consumer Products, L.P.

Jeffrey C. Bates Esq.
On behalf of Appleton Papers Inc.

J. Andrew Schlickman
On behalf of NCR Corporation

**Attachment C:**     Pertinent Excerpts of December 2002 Record of Decision

Wisconsin Department of Natural Resources
101 South Webster Street
Madison, Wisconsin 53707

Northeast Regional Headquarters
1125 North Military Avenue
Green Bay, Wisconsin 54307



United States Environmental Protection Agency
Region 5
77 West Jackson Blvd.
Chicago, IL 60604



# Record of Decision
# Operable Unit 1 and Operable Unit 2
# Lower Fox River and Green Bay, Wisconsin



# Record of Decision
# Responsiveness Summary

# December 2002

Copies of the various supporting reports and the proposed plan were made available to the public during a public comment period that began on October 5, 2001 and concluded on January 22, 2002. Approximately 4,800 written comments were received via letter, fax and e-mail. A copy of the Responsiveness Summary for these comments is attached to this ROD. Originally, the comment period was for 60 days, ending on December 7, 2001. The announcement of the extension until January 22 was published through newspaper advertisements and news releases on October 25, 2001. Newspaper advertisements were placed in the Green Bay Press Gazette and the Appleton Post Crescent announcing the availability of the plan and its supporting documents, and a brief summary of the plan in the information repositories. The proposed plan, the RI/FS and other supporting documents containing information upon which the proposed alternative was based were also made available on the Internet at www.dnr.state.us/org/water/wm/lowerfox/index.html and at the EPA Region 5 web site. All documents were also available as part of the Administrative Record housed at WDNR offices in Madison, Wisconsin and Green Bay, Wisconsin and at the EPA Region 5 office in Chicago, Illinois.

## 4.    SCOPE AND ROLE OF RESPONSE ACTION

As with many Superfund sites, the problems at the Lower Fox River and Green Bay Site are complex.  As a result, WDNR and EPA organized the Site into five OUs described in Section 1.1, above.

The Proposed Plan, issued October 2001, recommended a cleanup plan for all five Operable Units at the Site.  However, at this time, WDNR and EPA are issuing a ROD for the Fox River OUs 1 and 2 only.  WDNR and EPA expect to issue a ROD for OUs 3, 4 and 5 at a later date.

The reasons for issuing a ROD at this time for only OUs 1 and 2, and not for OUs 3, 4 and 5, are as follows:

▪ OU 1 and 2 represent a smaller portion of the area within the Fox River where remediation is necessary.  These two Operable Units represent approximately 6.5 percent of the PCB mass and 18 percent of the sediment volume in the Lower Fox River.  Consequently, these two Operable Units represent a more manageable project than conducting all of the remediation at one time.

▪ Provide a phased approach to the remedial work.   Work on upstream areas, OUs 1-2 can start before the downstream areas, OUs 3, 4, and 5.  This is consistent with the EPA policy Memorandum by Marianne Horinko, "OSWER Directive 8258.6-08, Principles for Managing Contaminated Sediment Risks at Hazardous Waste Sites," dated February 12, 2002.  Principles described in this memorandum include, "Control Sources Early," and "Use an Iterative Approach in a Risk Based Framework."  Additionally, the NCP states at 300 CFR Section 430(a)(1)(ii):

> *"Program Management Principles.*  EPA generally should consider the following general principles of program management during the remedial process:
>
> Sites should generally be remediated in Operable Units when....phased analysis and response is necessary or appropriate given the size or complexity of the site...."

▪ Planning for OUs 3, 4, and 5 may benefit from knowledge gained on the OUs 1 and 2 project.

The primary objective of this response action is to address the risks to human health and the environment due to PCBs in the in-place sediments of OUs 1 and 2 in the Lower Fox River. PCB concentrations remain elevated in Fox River sediments, in the water column and in the fish. Removal of the PCB-contaminated sediments will result in reduced PCB concentrations in fish tissue, thereby accelerating the reduction in future human health and ecological risks. In addition, by addressing the sediments, the remediation will control a source of PCBs to the water column, which contributes to fish tissue concentrations and transports PCBs into downstream reaches of the River, Green Bay, and eventually to Lake Michigan.

## 5. PEER REVIEW

To ensure the credibility of the scientific work conducted during the Remedial Investigation/Feasibility Study (RI/FS), EPA conducted both forms of peer involvement: peer input and peer review. Peer input was conducted through internal Agency reviews, and reviews by other agencies and Tribes. Peer review was also conducted, in accordance with EPA guidance outlined in the Peer Review Handbook (dated December 1998, updated December 2000). The peer review was conducted by independent experts who were unaffiliated with EPA, WDNR, the FRG or other Site stakeholders, and was undertaken on some of the major scientific aspects that form the basis for this decision.

Two separate EPA-sponsored peer review panels were convened. The review process consisted of each panel conducting an independent review by three panel members, with technical and administrative support by an EPA-contractor. The EPA contractor was responsible for convening the panels, consistent with the "charge" given by EPA for the panel review. This peer review was undertaken without influence by EPA, WDNR, the FRG or other interested parties. This was to provide an independent analysis and comment on key documents and issues related to development of a proposed remedy. Specifically, the panels were asked to evaluate:

▪ Adequacy of data considered in the 1999 Draft Lower Fox River Remedial Investigation, relative to data quality and quantity (RI Panel), and

▪ Natural recovery and environmental transformation, i.e., biological breakdown of PCBs (FS Panel). Natural recovery was defined by the panel as naturally occurring physical, chemical, or biological processes that reduce the risks associated with contaminants in sediments over time.

Each peer review panel was asked to address specific questions (i.e., the "charge") regarding the report being reviewed, including key controversial issues identified by EPA. The RI and FS panels issued reports October 7, 1999, and September 28, 1999, respectively.

The following summarizes the major findings of each of the panels:

▪ Data are adequate to determine the distribution of contaminants (i.e., it can be decided where cleanups should take place), if all data sources are considered (i.e., the RI does not provide a complete record).

▪ Data from all available sources are adequate to support identification and selection of a remedy for those technologies (e.g., dredging and capping) that have been used on a large scale at other, similar sites. Data are insufficient for developing in situ bio-technologies that may be applicable to the Site.

▪ Substantial improvements or additions to the existing data set are not indicated.

Commercially manufactured PCBs consisted of complex mixtures of congeners, known under various trade names. These PCBs were marketed under the general trade name "Aroclors." About 140 to 150 different congeners have been identified in the various commercial Aroclors, with about 60 to 90 different congeners present in each individual Aroclor.

The polychlorinated biphenyls (PCBs) used in the production of carbonless copy paper by paper manufacturing facilities on the Fox River from 1954 to 1971, consisted largely of the Aroclor identified as "1242." Carbonless copy paper produced during this time contained approximately 3.4 percent PCBs by weight.

Other contaminants of potential concern (e.g., mercury, lead, arsenic, dieldrin, DDT/DDE/DDD, furan, and dioxin) are also present, but are not significant risk drivers due to relatively low concentrations.

**Sources**

Twenty paper mills are located along the portion of the Fox River included in the Site. Among that group of companies, six engaged in the production or de-inking of carbonless copy paper containing PCBs. As a result of those processes, these mills discharged PCBs to the Lower Fox River. It is estimated that the wastewater discharged by the paper mills either directly or indirectly (through publicly owned treatment works) into the Fox River released an estimated 690,000 pounds of PCBs into the Lower Fox River.

**Contaminated Media**

Sediment
Much of the volume of PCBs discharged into the Lower Fox River in the past has already been transported throughout the system and is now concentrated in sediment within specific areas. In general, the upper three River reaches can be characterized as having discrete soft sediment deposits within inter deposit areas that have little or no soft sediment. In contrast, the last River reach from De Pere to Green Bay is essentially one large, continuous soft sediment deposit. Because there were several points of PCB discharge along the entire length of the Lower Fox River, PCB concentrations and mass distributions are highly variable. Table 1 summarizes the distribution of PCBs within OU 1 and OU 2 sediments.

**Table 1         PCB Distribution in the Lower Fox River OUs 1 and 2**

| River Reaches | Sediment Volume (cy) | PCB Mass (kg) | PCB Mass in Top 100 cm (%) |
|---|---|---|---|
| OU 1- Little Lake Butte des Morts | 2,200,400 | 1,849 | 98% |
| OU 2 - Appleton to Little Rapids | 339,200 | 109 | 100% |

Transport of PCBs in Fox River
Contaminant fate and transport in the Lower Fox River and Green Bay are largely a function of deposition, suspension, and redeposition of the Chemicals of Concern (COC) that are bound to sediment particles. The organic COCs (PCBs, pesticides) exhibit strong affinities for organic material in the sediment. The ultimate fate and transport of these organic compounds depends significantly on the rate of flow and water velocities through the River and Bay. More sediment becomes suspended and transported downstream during high-flow events like storms and spring snowmelt. High-flow events occur approximately 15 to 20 percent of the time, but can transport more than 50 to 60 percent of the PCB mass that moves annually. In any event, less than 1 kilogram/year enters Little Lake Butte des Morts from Lake Winnebago and 40 kilograms (88 pounds)/year are resuspended and transported from Little Lake Butte des Morts to OU 2

(Little Rapids Reach). An estimated 64 kilograms (141 pounds)/year migrate from OU 2 downstream. This estimate does not consider removal of the Deposit N or for possible actions for Deposit DD. Other modes of contaminant transport, such as volatilization, atmospheric deposition, and point source discharges, are negligible when compared to sediment resuspension.

Changes in Sediment Bed Elevation

The Lower Fox River is an alluvial river that exhibits significant changes in bed elevations over time in response to changing volumes of flow during annual, seasonal, and storm events, changes in sediment load, and changes in its base level, which is determined by Lake Michigan. Sediment in the riverbed is dynamic and does not function as discrete layers. River sediment movement is in marked contrast to the sediment dynamics found in a large quiescent body of water, such as deep lakes, or the deeper portions of Green Bay. Scouring of the sediment bed plays a significant role in the quantity of sediment and contaminants transported through the River system. In response to comments received from the FRG on the 1999 draft RI/FS to the effect that less than one inch of sediment would be resuspended from the riverbed as a result of a 100-year storm event, WDNR and EPA investigated changes in sediment bed elevation for the De Pere to Green Bay River reach (OU 4). This work is partially relevant to OU 1 and OU 2, but is informative regarding movement of Fox River sediments generally. This work (see Technical Memo 2g of the Model Documentation Report) was completed by a group called the FRG/WDNR Model Evaluation Workgroup as part of the 1997 agreement between the FRG and WDNR. Additional evaluation by EPA was consistent with changes documented in Technical Memo 2g.

Results of these analyses indicate that sediment bed elevation changes occur in the Lower Fox River over both short- and long-term time frames. Changes in sediment bed elevation were observed both across the channel and downstream profiles. These changes show little continuity. Since River flows have not significantly changed in recent years, the complexity of these sediment bed elevation changes reflects the prevailing hydrologic and sediment conditions that occurred over a 22-year period from 1977 through 2000. The wide range of discharges and sediment loads continuously reshapes the Lower Fox River sediment bed. Short-term (e.g., annual and sub-annual) changes in average net sediment bed elevations range from a decrease or scour of over 11 inches to an increase or deposition of over 14 inches. Long-term (e.g., over several years) changes in average net elevations range from a decrease of more than 39 inches to an increase of nearly 17 inches. The changes documented are well supported by U.S. Army Corps of Engineers (USACE) sediment volume calculations from pre- and post-dredge sediment bed elevation surveys, as well as by results of a U.S. Geological Survey (USGS) analysis of bed surveys performed at intermediate time scales (e.g., 8 months to 45 months).

Surveys of the River bottom, conducted by several different groups, show significant changes in sediment bed elevation. On average, sediment bed elevation data from throughout the De Pere to Green Bay reach suggest that this River reach is a net depositional zone. However, when examined at a finer scale, the data show areas of sediment scour up to 14 ft. It should be noted that during the survey period, there were no large storm events of a 10-year or greater magnitude. It is unknown what the scour would be during larger events.

For OUs 1 and 2, PCBs are often high in surficial sediments. This is indicative that higher concentrations of PCBs continue to be exposed or re-exposed.

**Table 19        Post-Remediation Sediment and Surface Water Concentrations in OU 1**

| Alternative | Average PCB Concentrations in Surficial Sediments (ppm) | Estimated Surface Water Concentrations 30-years after Remediation (ng/L) |
|---|---|---|
| A, B | 3.699 | 2.99 |
| C1, C2, D, E, F | 0.185 | 0.18 |

*Data is from FS Tables 5-4, and 8-5B.*

Time to reach acceptable fish tissue concentrations

Substantial reductions in the time when humans could safely consume fish are achieved by active remediation alternatives (C1, C2, D, E, and F), when compared to the No Action and Monitored Natural Recovery (MNR) alternatives (A and B). The implementation of active remediation alternatives results in an 86 percent to 99 percent reduction in the time required to reach acceptable fish tissue concentrations in walleye when compared to the No Action or MNR alternatives (i.e., 1 to 14 years for active remediation versus 51 to 100 years for No Action or MNR – see Table 20). Recovery times for additional human health receptors are presented the FS, Chapter 8, Table 8-6.

**Table 20        Time Achieve Acceptable Fish Tissue Concentrations for Walleye in OU 1**

| Fish | Receptor | Risk Level Goal | Estimated Years to Achieve | |
|---|---|---|---|---|
| | | | Alternatives C1, C2, D, E, F | Alternatives A, B |
| Walleye | Recreational Angler | RME Hazard Index of 1.0 | <1 | 51 |
| Walleye | High Intake Fish Consumer | RME Hazard Index of 1.0 | 4 | 65 |
| Walleye | Recreational Angler | RME $10^{-5}$ cancer risk level | 9 | 84 |
| Walleye | High Intake Fish Consumer | RME $10^{-5}$ cancer risk level | 14 | 100 |

*Data is from FS Table 8-14.*

Time required to achieve surface sediment concentration protective of fish or other biota

Substantial reductions in the time required to reach protective levels for ecological receptors are achieved by all active remediation alternatives (C1, C2, D, E, and F) relative to the No Action and MNR alternatives. For receptors representative of fish or other biota, implementation of active remediation alternatives results in a 40 percent to 86 percent reduction relative to No Action or MNR (i.e., 14 to 60 years for active remediation versus 100 years or more for No Action and MNR, shown in Table 21, below). Recovery times for additional ecological receptors are presented in the FS, Chapter 8, Table 8-6.

**Table 21        Time Required to Achieve Protective Levels in Sediments for Representative Ecological Receptors in OU 1**

| Fish | Receptor | Risk Level Goal | Estimated years to achieve | |
|---|---|---|---|---|
| | | | Alternatives C1, C2, D, E, F | Alternatives A, B |
| Carp | Carnivorous bird | NOAEC | 14 | 100 |
| Carp | Piscivorous mammal | NOAEC | 29 | >100 |
| Sediment | Sediment invertebrate | TEL | 60 | >100 |

*Data is from FS Table 8-16.*

PCB loadings to downstream areas and total mass contained or removed
Reduction of the PCB load transported over the Appleton Dam into the downstream areas of the Fox River is a measure of the overall protection of human health and the environment. Reduced PCB loading from OU 1 will ultimately contribute to downstream reduction of concentrations of PCBs in sediment, water and fish, and thereby reduce risk to humans and ecological receptors in the Fox River. After implementation of active remedial alternatives (C1, C2, D, E, and F) estimates for releases over the Appleton Dam would be reduced from 88 pounds/year presently to 1.5 pounds/year 30 years after completion of remediation, compared to 25 pounds for the No Action and MNR alternatives (also after 30 years). Thus the active remedial alternatives would give a 94 percent reduction in loadings relative to No Action and MNR.

**Summary**

The active remediation alternatives provide a substantially more protective remedy than the No Action and MNR alternatives. The No Action and MNR Alternatives are not protective of human health and the environment.

Compliance with Applicable or Relevant and Appropriate Requirements (ARARs)
Section 121 (d) of CERCLA and NCP §300.430(f)(1)(ii)(B) requires that remedial actions at CERCLA sites attain legally applicable or relevant and appropriate Federal and State requirements, standards, criteria and limitations which are collectively referred to as "ARARs," unless such ARARs are waived under CERCLA section 121(d)(4).

Compliance with ARARs addresses whether a remedy will meet all of the applicable or relevant and appropriate requirements of other Federal and State environmental statutes or provides a basis for invoking a waiver.

The ARAR discussion, below, is divided by the different operational components of the alternatives (Table 22, and discussion below), as various components are utilized in an essentially the same manner for some alternatives and apply equally to those alternatives with a common component. There is also additional discussion of ARARs in Section 14.2.

**Table 22     Operational Components for OU 1 Alternatives**

| | | Alternatives | | | | | |
|---|---|---|---|---|---|---|---|
| | | A | B | C1 | C2 | D | E | F |
| Removal | | | | X | X | X | X | X |
| Dewatering | Mechanical | | | | X | | | |
| | Passive | | | X | | X | X | X |
| Sediment Treatment | | | | * | * | | X | * |
| Water Treatment | | | | X | X | X | X | X |
| Trucking or Rail Transportation | | | | X | X | X | X | X |
| Disposal | Upland | | | X | X | X** | (residuals) | X |
| | In-water CDF | | | | | X | | |
| Capping | | | | | | | | X |

*X: Required activity for alternative.*
*\* Possible supplement.*
*\*\* Upland disposal for this alternative would only be for sediments with PCB concentrations equal to or greater than 50 ppm (16,165 cubic yards of 800,357). Sediments with concentrations less than 50 ppm (784,192 cubic yards) would be disposed in an in-water CDF.*

## CERTIFICATE OF SERVICE

        Pursuant to Paragraph 124 of the Consent Decree in this case, I hereby certify that copies of the foregoing Brief were served on this date by the Court's Electronic Case Filing system and by first-class mail, postage prepaid, upon the following individuals:

Nancy K. Peterson
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI  53202-4497

J.P. Causey Jr.
Vice President & Corporate Secretary
WTM I Company
c/o Chesapeake Corporation
1021 E. Cary Street
P.O. Box 2350
Richmond, VA   23218-2350

Patrick H. Zaepfel
Kegel Kelin Almy & Grimm LLP
24 North Lime Street
Lancaster, PA  17602-2913

David G. Mandelbaum
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA   19103-7599

Thomas J. Dawson and Jerry L. Hancock
Assistant Attorneys General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI   53707-7857

Matthew V. Richmond
Assistant United States Attorney
Eastern District of Wisconsin
U.S. Courthouse and Federal Building -
Room 530
517 E. Wisconsin Avenue
Milwaukee, WI   53202

Richard M. Murawski
Associate Regional Counsel (C-14J)
U.S. Environmental Protection Agency
77 W. Jackson Blvd.
Chicago, IL  60604

Douglas P. Dixon
U.S. Environmental Protection Agency
Ariel Rios Building - Mail Code 2272A
1200 Pennsylvania Avenue, N. W.
Washington, DC  20460

Dated:  December 14, 2007                 *s/ Randall M. Stone*